[No. B096075. Second Dist., Div. Three. May 23, 1996.]

STATE FARM FIRE AND CASUALTY COMPANY et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; IRENE ALLEGRO et al., Real Parties in Interest.

COUNSEL

Robie & Matthai, James R. Robie, Michael J. O'Neill and Pamela E. Dunn for Petitioners.

Chapman, Popik & White, Susan M. Popik, Horvitz & Levy, David M. Axelrad, Lisa Perrochet and Andrea M. Gauthier as Amici Curiae on behalf of Petitioners.

No appearance for Respondent

Shernoff, Bidart & Darras, Michael J. Bidart and Sharon J. Arkin for Real Parties in Interest.

## OPINION

**CROSKEY, J.**—Petitioners State Farm Fire and Casualty Company and State Farm Mutual Automobile Company (collectively State Farm) are defendants in an action filed by 165 individual plaintiffs who were insured by petitioners and allege a number of claims relating to the Northridge earthquake on January 17, 1994. State Farm filed a demurrer to plaintiffs' first amended complaint on three grounds which are relevant here: (1) plaintiffs' fifth cause of action, based on an alleged violation of Business and Professions Code section 17200, failed to state sufficient facts to constitute a cause of action; (2) the court lacks primary jurisdiction over the subject matter of the action until plaintiffs' complaints are first presented to and addressed by the Insurance Commissioner; and (3) there is a misjoinder of plaintiffs.[1] The demurrer was overruled in its entirety and State Farm has petitioned this court for a writ of mandate.

We find that a cause of action limited to a request for injunctive or restitutive relief can be prosecuted under Business and Professions Code section 17200 based upon an insurer's alleged fraudulent misconduct and breach of the covenant of good faith implied in every policy of insurance; that such alleged acts might also violate the provisions of Insurance Code

---

[1]State Farm raised other pleading objections to plaintiffs' first amended complaint but these three grounds are the only ones presented to us by the pending request for writ relief.

section 790.03 (section 790.03) does not justify application of the bar against *statutory* bad faith claims announced in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*). We therefore conclude that State Farm's demurrer to plaintiffs' fifth cause of action was correctly overruled. We also reject State Farm's arguments based upon the primary jurisdiction doctrine and its claim that there was a misjoinder of plaintiffs. We therefore deny the requested writ relief.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts upon which this case must turn are those alleged in plaintiffs' complaint, which, under the usual appellate standard, we accept as true.

On April 17, 1995, plaintiffs filed their first amended complaint against State Farm and 85 separately named individual defendants alleged to be the agents of State Farm who marketed and sold to plaintiffs the several policies of homeowner insurance at issue in this case. Plaintiffs allege that each of them were sold policies of homeowner insurance issued by State Farm which covered real and personal property owned by them. While plaintiffs allege that each of them suffered damage in the Northridge earthquake, the amount of such damage differs with respect to each plaintiff.

Prior to 1985, State Farm provided earthquake coverage as an endorsement to its homeowner policies but, in that year, began providing such coverage by "a separate policy covering only the peril of earthquake." Plaintiffs allege that this was done without their consent and without adequate notice of the significant reduction in coverage which they claim was the object and result of this tactic.[2] Because the premium for the pre-1985 earthquake *endorsement* was the same as for the post-1985 *separate policy,* plaintiffs were "duped" into believing that they would receive the same coverage. Plaintiffs allege that they did not in fact receive the same coverage and that State Farm engaged in this restructuring of its homeowner policies in order to reduce its exposure while earning the same premium income and thereby increasing its profits.

Plaintiffs allege that this amounted to a false, fraudulent and unfair plan or scheme to "limit its risk of losses arising from the peril of earthquake while maximizing profits." Plaintiffs then alleged some 15 different types of

---

[2]From the complaint it is not entirely clear just how State Farm reduced coverage. From reading the complaint we can only determine that there was "a substantially lower coverage limit," with "no guaranteed replacement coverage," and an "express limit for land or stabilization to land" was added.

"improper claims handling processes" which were engaged in by State Farm. Plaintiffs allege that State Farm "systematically, methodically and generally" engaged in these "improper, unfair and unreasonable claims practices."[3] These allegations of fraudulent misrepresentations and unfair and

[3] As they serve as the foundation for State Farm's argument that plaintiffs are improperly seeking recovery for violations of subdivision (h) of section 790.03, we set forth verbatim the allegations of the said claims handling practices:

"1. Deliberately and unreasonably failing to provide notice or information to the plaintiffs that, in addition to their claims under the earthquake policies, plaintiffs were entitled to payment and reimbursement for certain losses under plaintiffs' homeowner's coverage separately and independently of the earthquake coverage and unreasonably failing and refusing to process the damages which STATE FARM knew were covered under the homeowner's policies under the provisions of those policies;

"2. Deliberately and unjustifiably estimating the losses claimed by plaintiffs at substantially and significantly less than the actual losses incurred, a practice known as "low-balling;"

"3. Deliberately and unjustifiably attempting to assess losses covered under the policy as attributable to "pre-existing" defects in the property;

"4. Deliberately and unjustifiably failing and refusing to warn or give notice to their insureds of the danger and risk of exposure to asbestos contamination to the plaintiffs resulting from the covered property damage to the dwelling;

"5. Deliberately and unjustifiably retaining unlicensed, uncertified and/or unqualified contractors, engineers, and testing companies who were inadequately trained or inadequately equipped to conduct the necessary testing, surveying, analysis, estimation and investigation of plaintiffs' losses;

"6. Failing to provide benefits for land stabilization when the stabilization was necessary to the proper stabilization and foundationalization of the dwelling;

"7. Improperly, unjustifiably and illegally deducting the amount of profit and overhead included by contractors in their bids for repair and replacement of plaintiffs' properties, typically in the amount of 20% of the costs for labor and materials, in calculating the replacement cost of the property claims made by plaintiffs;

"8. Improperly, unjustifiably and in violation of California law, calculating the actual cash value of the property on the basis of replacement cost less depreciation when, under California law, defendant is required to base actual cash value on fair market value of the property prior to the loss;

"9. Improperly and unjustifiably failing to provide fair rental value as an alternative to incurred expenses under the additional living expense provisions of the policies;

"10. Unreasonably and unjustifiably failing to timely and fully pay plaintiffs' claims under the policies;

"11. Unreasonably and unjustifiably failing to provide plaintiffs with guaranteed replacement cost benefits and full policy limits equivalent to the plaintiffs' homeowner's coverage limits in contradiction of defendants' agents representations to plaintiffs the plaintiffs were fully covered;

"12. Unreasonably and unjustifiably failing and refusing to provide sufficient and adequate payment for asbestos abatement and/or seeking to force plaintiffs to return to their asbestos-infested homes by refusing to provide sufficient and adequate additional living expenses;

"13. Unreasonably and unjustifiably failing and refusing to pay for costs incurred in retaining and utilizing structural engineers, soils engineers, contractors, asbestos testing companies and other experts necessary to determine the damages suffered by plaintiffs.

"14. Unreasonably and unjustifiably delaying payment of benefits which STATE FARM admittedly owed and thereby causing further structural damage to plaintiffs' structures.

unreasonable claims practices also serve as the basis for plaintiffs' fifth cause of action for relief under Business and Professions Code section 17200 et seq., the Unfair Competition Act (hereafter the UCA.)

In order to seek redress for State Farm's alleged fraudulent, unfair and unlawful practices, plaintiffs asserted claims for (1) breach of the implied covenant of good faith (i.e., common law "bad faith"), (2) breach of contract, (3) professional negligence, (4) fraud, (5) violation of the UCA and (6) reformation.

State Farm filed a demurrer and a motion to strike to the entire complaint, which were overruled and denied, respectively. State Farm was given 30 days to answer the complaint.[4] Instead, State Farm has petitioned this court for a writ of mandate in which it seeks to overturn the trial court's ruling as to (1) the fifth cause of action (brought under the UCA), (2) the request for a stay of the entire action pending investigation and review of State Farm's marketing practices by the Insurance Commissioner and (3) the demurrer for misjoinder of plaintiffs.

On October 25, 1995, we issued an alternative writ, stayed all further proceedings in the trial court and set this matter for hearing.

### CONTENTIONS OF THE PARTIES

State Farm asserts three basic contentions: (1) plaintiffs' attempt in their fifth cause of action to allege a claim under the UCA is an improper attempt to plead around the bar against statutory bad faith actions announced in *Moradi-Shalal*, and therefore State Farm's demurrer should have been sustained as to that cause of action; (2) plaintiffs' complaint, in effect, challenges the way State Farm packages and prices earthquake insurance and this involves an industry-wide issue which is regulated by the Insurance Commissioner; under the primary jurisdiction doctrine (see *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377 [6 Cal.Rptr.2d 487, 826 P.2d 730]), the entire action should be stayed until the commissioner has investigated and acted upon plaintiffs' complaints; and (3) plaintiffs are 165

---

"15. Unreasonably and unjustifiably contacting insureds who were represented by counsel and attempting to convince plaintiffs to, or coerce plaintiffs into, terminating their legal representation."

[4]Because the trial court anticipated that during discovery facts might be developed regarding the existence of affirmative defenses against some or all of the 165 plaintiffs, it obtained the stipulation of plaintiffs that State Farm be allowed to answer with general denials without prejudice to adding special or affirmative defenses as plaintiffs' claims were clarified by discovery.

separate individuals with disparate claims who have been improperly joined together in this action without a common occurrence or common question of law or fact; thus, State Farm's demurrer for misjoinder should have been sustained.

Plaintiffs dispute each of these contentions and argue that: (1) they are not seeking to recover under section 790.03 and therefore their fifth cause of action in no way implicates the bar announced in *Moradi-Shalal*; (2) they are seeking to recover on recognized principles of common law liability and are not raising issues which require the courts to defer to the primary jurisdiction of the Insurance Commissioner; and (3) joinder of the plaintiffs was proper in this case.

## DISCUSSION

### 1. *The Demurrer to the Fifth Cause of Action Was Properly Overruled*

#### a. *Nature of an Action Under the Unfair Competition Act*

The statutory scheme of the UCA is straightforward. In section 17200 of the Business and Professions Code (section 17200) any *"unlawful," "unfair"* or *"fraudulent"* business act or practice is deemed to be unfair competition. Under the UCA, injunctive relief to prevent such conduct, and/or restitution (i.e., disgorgement) of money or property wrongfully obtained "by means of such unfair competition," are authorized. (Bus. & Prof. Code, § 17203;[5] *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

The statute imposes strict liability. It is not necessary to show that the defendant intended to injure anyone. (*People* ex rel. *Van de Kamp* v. *Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 760-761 [251 Cal.Rptr. 657].) Because section 17200's definition is disjunctive, a "business act or practice" is prohibited if it is "unfair" *or* "unlawful" *or* "fraudulent." In other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa. (*Motors, Inc.* v. *Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740, fn. 2 [162 Cal.Rptr. 543].) Virtually any law—federal,

---

[5]Business and Professions Code section 17203 provides: "Any person *who engages, has engaged, or proposes to engage in unfair competition may be enjoined* in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or *as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.*" (Italics added.)

state or local—can serve as a predicate for a section 17200 action. (*People* v. *E.W.A.P., Inc.* (1980) 106 Cal.App.3d 315, 319 [165 Cal.Rptr. 73].)

■ As the California Supreme Court recently wrote, section 17200 "borrows" violations of other laws and treats them as unlawful practices independently actionable under the UCA. (*Farmers Ins. Exchange* v. *Superior Court, supra*, 2 Cal.4th at p. 383.) The "unlawful business activity" which is proscribed by section 17200 includes " '*anything* that can properly be called a business practice and that at the same time is forbidden by law.' " (*Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817] [decided under section 17200's predecessor, subdivision 3 of former Civil Code section 3369], italics added.) Most reported cases involving "*unlawful* business practices," however, have been predicated on state law violations. Laws that have been enforced under section 17200's "unlawful" prong include state antidiscrimination laws (*Consumers Union of United States, Inc.* v. *Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1444 [257 Cal.Rptr. 151]); state antitrust laws (*B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1348 [235 Cal.Rptr. 228]); state criminal laws (*People* v. *E.W.A.P., Inc., supra*, 106 Cal.App.3d at p. 318); state environmental protection laws (*People* v. *K. Sakai Co.* (1976) 56 Cal.App.3d 531 [128 Cal.Rptr. 536]); state fish and game laws (*People* ex rel. *Van de Kamp* v. *Cappuccio, Inc., supra*, 204 Cal.App.3d at p. 759); state housing laws (*Hernandez* v. *Stabach* (1983) 145 Cal.App.3d 309, 314-315 [193 Cal.Rptr. 350]); state labor laws (*People* v. *Los Angeles Palm, Inc.* (1981) 121 Cal.App.3d 25, 32-33 [175 Cal.Rptr. 257]); and state vehicle laws (*People* v. *James* (1981) 122 Cal.App.3d 25, 35-36 [177 Cal.Rptr. 110].) Although the "business of insurance" has expressly been made subject to the provisions of the UCA (Ins. Code, § 1861.03), the provisions of section 790.03 may *not* be "borrowed" to serve as a basis for an action under the UCA. (*Manufacturers Life Ins. Co.* v. *Superior Court* (1995) 10 Cal.4th 257, 283-284 [41 Cal.Rptr.2d 220, 895 P.2d 56].) As we discuss below, this circumstance serves as the principal basis for State Farm's argument in this matter.

However, it is not necessary for a business practice to be "unlawful" in order to be subject to a UCA action. The "unfair" standard, the second prong of section 17200, also provides an independent basis for relief. This standard is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. (*Motors, Inc.* v. *Times Mirror Co., supra*, 102 Cal.App.3d at 740.) The test of whether a business practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged

wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . [Citations.]" (*Ibid.*) In *People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509 [206 Cal.Rptr. 164, 53 A.L.R.4th 661], the court, acknowledging that the parameters of the term "unfair business practice" had not been defined in a California case, applied guidelines adopted by the Federal Trade Commission and sanctioned by the United States Supreme Court in *FTC* v. *Sperry & Hutchinson Co.* (1972) 405 U.S. 233, 244 [31 L.Ed.2d 170, 179, 92 S.Ct. 898].[6] The court concluded that an "unfair" business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." (*People* v. *Casa Blanca Convalescent Homes, Inc., supra,* 159 Cal.App.3d at p. 530.)

Examples of unfair business practices include: charging a higher than normal rate for copies of deposition transcripts (by a group of certified shorthand reporters), where the party receiving the original is being given an undisclosed discount as the result of an exclusive volume-discount contract with two insurance companies (*Saunders* v. *Superior Court* (1994) 27 Cal.App.4th 832, 840-841 [33 Cal.Rptr.2d 438]); placing unlawful or unenforceable terms in form contracts (*People* v. *McKale* (1979) 25 Cal.3d 626, 634-635 [159 Cal.Rptr. 811, 602 P.2d 731]); asserting a contractual right one does not have (*People* v. *McKale, supra,* 25 Cal.3d at p. 635; *People* v. *Custom Craft Carpets, Inc.* (1984) 159 Cal.App.3d 676, 683-684 [206 Cal.Rptr. 12]); systematically breaching a form contract affecting many consumers (*Orkin Exterminating Co., Inc.* v. *F.T.C.* (11th Cir. 1988) 849 F.2d 1354, 1367-1368), or many producers (*Allied Grape Growers* v. *Bronco Wine Co.* (1988) 203 Cal.App.3d 432, 449-453 [249 Cal.Rptr. 872]); and imposing contract terms that make the debtor pay the collection costs (*Bondanza* v. *Peninsula Hospital & Medical Center* (1979) 23 Cal.3d 260, 266-267 [152 Cal.Rptr. 446, 590 P.2d 22]).

■ "Bad faith," as that term is used in litigation between insurers and insureds, signifies a breach of the covenant of good faith and fair dealing

---

[6]In *Sperry*, the Supreme Court said: "The [Federal Trade] Commission has described the factors it considers in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is nonetheless unfair: [¶] '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " (*FTC* v. *Sperry & Hutchinson Co., supra,* 405 U.S. at pp. 244-245, fn. 5 [31 L.Ed.2d at p. 179].)

that is implied by law in every contract. Breach of this implied covenant involves something beyond breach of the specific contractual duties. It implies *unfair dealing* rather than just mistaken judgment. (*Congleton* v. *National Union Fire Ins. Co.* (1987) 189 Cal.App.3d 51, 59 [234 Cal.Rptr. 218].) It is an insurer's responsibility to act *fairly and in good faith* with respect to an insured's claim. This is not the " 'requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation . . . under which the insurer must act fairly and in good faith in discharging its contractual responsibilities.' [Citation.]" (*California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 54 [221 Cal.Rptr. 171], quoting from *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573-574 [108 Cal.Rptr. 480, 510 P.2d 1032].) "Thus, allegations which assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence *but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.* Just what conduct will meet these criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties." (*Careau & Co.* v. *Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395 [272 Cal.Rptr. 387].) Given these established characteristics of the concept of "bad faith," we have no trouble concluding that an insurer's conduct constituting a breach of the implied covenant of good faith may also constitute an *unfair* business practice under section 17200.

Finally, the "fraud" contemplated by section 17200's third prong bears little resemblance to common law fraud or deception. The test is whether the public is likely to be deceived. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].) This means that a section 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. (35 Cal.3d at p. 211.) No discussion is required to demonstrate that plaintiffs' allegations regarding State Farm's allegedly fraudulent acts easily satisfy this test.

b. *A Cause of Action Under the Unfair Competition Act Was Alleged*

The principal issue raised by this case is whether, given the foregoing and in light of the Supreme Court's decision in *Moradi-Shalal*, a cause of

action under the UCA may nonetheless be based on the allegations that State Farm fraudulently deceived the plaintiffs and breached the covenant of good faith implied in each of their policies. The issue is not, as State Farm seeks to frame it, whether plaintiffs can base their fifth cause of action on a violation of section 790.03.[7] As we have already noted, they cannot.

---

[7]At least three of the subdivisions of section 790.03 appear to be implicated by plaintiffs' allegations. Section 790.03 provides in relevant part: "The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.

"(a) Making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby or the dividends or share of the surplus to be received thereon, or making any false or misleading statement as to the dividends or share of surplus previously paid on similar policies, or making any misleading representation or any misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates, or using any name or title of any policy or class of policies misrepresenting the true nature thereof, or making any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his or her insurance.

"(b) Making or disseminating or causing to be made or disseminated before the public in this state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatsoever, any statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his or her insurance business, which is untrue, deceptive, or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue, deceptive, or misleading.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(h) Knowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices:

"(1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.

"(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

"(3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.

"(4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured.

"(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

"(6) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered.

"(7) Attempting to settle a claim by an insured for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application.

"(8) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of, the insured, his or her representative, agent, or broker.

"(9) Failing, after payment of a claim, to inform insureds or beneficiaries, upon request by them, of the coverage under which payment has been made.

While plaintiffs' allegations obviously charge violations of several of the statutory proscriptions in section 790.03 (see fn. 7, *ante*), they also allege acts amounting to common law fraud and multiple breaches of the implied covenant of good faith. A claim for injunctive or restitutive relief under the UCA can be based on *any* fraudulent or unlawful or unfair business activity. Plaintiffs' allegations quite obviously include examples of all three. This leaves us with the question of whether such allegations of fraudulent and unfair business activity are sufficient, notwithstanding *Moradi-Shalal,* to state a cause of action for relief under the UCA.[8] We believe the answer must be yes.

While *Moradi-Shalal* clearly held that the Legislature did not intend to create new causes of action when it enacted section 790.03, it is also clear that the Legislature did not intend in any way to circumscribe the previously existing common law right of an insured to seek redress for an insurer's fraudulent deception or breach of the covenant of good faith implied in the policy. *Moradi-Shalal,* as correctly understood, " 'marks a return to the fundamental principal that [section 790.03], like all statutes, is to be applied according to its terms. Its language neither creates new private rights *nor*

---

"(10) Making known to insureds or claimants a practice of the insurer of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration.

"(11) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either, to submit a preliminary claim report, and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.

"(12) Failing to settle claims promptly, where liability has become apparent, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.

"(13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement.

"(14) Directly advising a claimant not to obtain the services of an attorney.

"(15) Misleading a claimant as to the applicable statute of limitations.

"(16) Delaying the payment or provision of hospital, medical, or surgical benefits for services provided with respect to acquired immune deficiency syndrome or AIDS-related complex for more than 60 days after the insurer has received a claim for those benefits, where the delay in claim payment is for the purpose of investigating whether the condition preexisted the coverage. However, this 60-day period shall not include any time during which the insurer is awaiting a response for relevant medical information from a health care provider."

[8]We express no opinion as to whether plaintiffs' UCA claims have any merit or whether plaintiffs will be able to establish sufficient facts to justify either injunctive or restitutive relief. This will be a matter for the trial court to resolve. We address only, and our decision is limited to, the legal issue of whether, in the context of the facts of this case, the bar of *Moradi-Shalal* (denying private rights of action based on alleged violations of section 790.03) precludes plaintiffs' UCA claims *as a matter of law.*

*destroys old ones.'*" (*Manufacturers Life Ins. Co.* v. *Superior Court, supra,* 10 Cal.4th at p. 279, quoting from the opinion of the Court of Appeal in that case, italics in original.) Indeed, the *Moradi-Shalal* court itself expressly held that ". . . the courts retain jurisdiction to impose civil damages *or other remedies* against insurers in appropriate common law actions, based on such traditional theories as *fraud,* infliction of emotional distress, and (as to the insured) either breach of contract or *breach of the implied covenant of good faith and fair dealing.*" (*Moradi-Shalal, supra,* 46 Cal.3d at pp. 304-305, italics added.) Thus, these common law claims remain as a firm legal basis on which an insured may rely to seek redress against an insurer.

Each of these claims is independently actionable and the allegations supporting them have been found sufficient by the trial court.[9] In our view, these independent bases for plaintiffs' UCA cause of action are not distinguishable from the independent Cartwright Act violation which the Supreme Court recently held was sufficient to support a claim for relief under the UCA, notwithstanding that the acts complained of also violated section 790.03. (*Manufacturers Life Ins. Co.* v. *Superior Court, supra,* 10 Cal.4th at p. 284.) In *Manufacturers Life,* the UCA was not being used to vindicate a claim under section 790.03, but rather it was utilized to enforce a claim under the Cartwright Act.[10] The same is true here. Plaintiffs do not seek to enforce section 790.03 claims, but rather are enforcing claims involving common law fraud and bad faith, both of which are independently actionable. It is not relevant that State Farm's alleged misconduct may *also* violate some of the provisions of section 790.03. Thus, the argument of State Farm, made in reliance on *Moradi-Shalal,* that recognition of plaintiffs' UCA cause of action would create a claim which is *otherwise* barred is without merit; nor do plaintiffs' allegations amount to a mere "relabeling."

In addition, neither *Moradi-Shalal,* nor any of the cases following it, involved an attempt, as we have here, to state a proper UCA cause of action seeking only injunctive or restitutive relief. Those cases all represent examples of a plaintiff's attempt to do an "end-run" on *Moradi-Shalal* and recover *damages* for conduct *which violated section 790.03* by recasting their claim on some ground other than that Insurance Code section. However, in none of

---

[9]As already noted, State Farm has not requested writ relief as to the trial court's order overruling its demurrer to plaintiffs' causes of action for fraud and common law bad faith.

[10]As the Supreme Court put it in *Manufacturers Life,* "Whether statutory causes of action under the Cartwright Act and the UCA may be stated against an insurance company was not an issue in *Moradi-Shalal* which, *in the context of bad faith refusal to settle claims,* overruled *Royal Globe* . . . and confirmed that section 790.03, subdivision (h), was not the source of a private right of action against an insurer *for that conduct.*" (*Manufacturers Life Ins. Co.* v. *Superior Court, supra,* 10 Cal.4th at p. 280, italics added.)

these cases was plaintiff's damage claim actually based on any ground other than a violation of section 790.03, and no relief other than damages was sought. (*American Internat. Group, Inc.* v. *Superior Court* (1991) 234 Cal.App.3d 749, 767-768 [285 Cal.Rptr. 765] [a Racketeer Influenced and Corrupt Organizations Act claim based on alleged violations of section 790.03, subdivision (h) would not support a civil damage recovery]; *Maler* v. *Superior Court* (1990) 220 Cal.App.3d 1592, 1598 [270 Cal.Rptr. 222] [the passage of Proposition 103, and particularly section 1861.03 which was thereby added to the Insurance Code, did not "supersede *Moradi-Shalal*'s ban on a private action for damages under section 790.03 [and a plaintiff] cannot circumvent that ban by bootstrapping an alleged violation of section 790.03 onto Business and Professions Code section 17200 so as to state a cause of action under section 1861.03."]; *Safeco Ins. Co.* v. *Superior Court* (1990) 216 Cal.App.3d 1491, 1494 [265 Cal.Rptr. 585] [an insurer's alleged failure to pay the cost of coverage on an automobile rented by a third party claimant after an accident was not actionable under the rule of *Moradi-Shalal* and this bar could not be avoided by recasting the claim as a violation of section 17200]; *Industrial Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1093, 1097 [257 Cal.Rptr. 655] [claim against insurer for violation of section 17200 arising from alleged violations of section 790.03 was not viable in light of *Moradi-Shalal:* ". . . a private right of action to many members of the class of consumers for whose benefit section 790.03, subdivision (h), of the Insurance Code was enacted does not exist after that decision."].)

In only one of these cases is there even a reference to injunctive relief. In *Safeco Ins. Co.* v. *Superior Court, supra,* "plaintiff claimed entitlement to *an injunction,* compensatory damages, additional compensation for prosecuting the action, punitive damages and attorneys' fees." (216 Cal.App.3d at p. 1493, italics added.) However, we agree with the comments recently made on this point by Justice Baxter: "[N]othing in *Safeco* . . . suggests that the claim for injunctive relief was anything more than a makeweight allegation. For all practical purposes the suit appears to have been for compensatory and punitive damages. The fact that the court never even discussed the claim for injunctive relief . . . suggests that no serious issue was ever raised as to injunctive relief." (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1210 [17 Cal.Rptr.2d 828, 847 P.2d 1044] (conc. and dis. opn. of Baxter, J.).) Nothing in *Moradi-Shalal* suggests that it was addressing anything other than the viability of an implied right of action for *damages.*

State Farm argues that recognition of a right of action in plaintiffs under the UCA *for conduct proscribed in section 790.03* would revive what the

Supreme Court called the "undesirable social and economic effects of the [Royal Globe] decision (i.e., multiple litigation, unwarranted bad faith claims, coercive settlements, excessive jury awards, and escalating insurance, legal and other 'transaction' costs)." (*Moradi-Shalal, supra,* 46 Cal.3d at p. 299.) Leaving aside the fact that State Farm's argument is predicated on its section 790.03 characterization of plaintiffs' allegations, we believe that this concern is overblown. The injunctive and restitutive remedies authorized under the UCA (see fn. 5, *ante.*) are of very limited utility. They are designed to *prevent* unfair business practices and to require *disgorgement* of money or property obtained by means of such practices. Damages are *not* available under Business and Professions Code section 17203. (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1266.) That means that no claim for compensatory or punitive damages can be recovered in a UCA action. It is therefore not at all clear to us how our application of the very clear language of the UCA will necessarily resurrect any of the perceived evils of *Royal Globe.* Moreover, in this case only a plaintiff who can point to insurer conduct which constitutes a fraud or breach of the implied covenant of good faith would have any basis for an action under the UCA. Without such independent bases for a section 17200 claim, none of the plaintiffs could plead a violation of that section.

We do not agree with State Farm's related argument that recognition of an injunctive remedy would interfere with the Insurance Commissioner's ability to uniformly regulate the insurance industry or even the marketing activities of a particular insurer. Contrary to State Farm's assertion, a court would not be asked to limit or regulate how State Farm could market its earthquake coverage. Rather, injunctive relief would only be addressed to the enjoinment of future acts of fraud or deception. Whether State Farm sells earthquake coverage separately or as part of a more general policy is not something a court would or should regulate. However, whether State Farm's marketing efforts work a fraud on its insureds is another matter entirely. A similar analysis would apply to State Farm's alleged bad faith claims practices.

Finally, as Business and Professions Code section 17205 states, ". . . the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under *all other laws of this state.*" (Italics added.) This statutory language strongly suggests that a claim for relief otherwise available under the provisions of the UCA should not be precluded by the circumstance that *if* it were instead based on violations of section 790.03, it would be barred as inconsistent with the rule announced in *Moradi-Shalal.* As we have discussed, State Farm's concern that such a

holding may present the spector of unrestricted use of UCA actions by insureds is unwarranted but, in any event, is a matter which should be addressed to the Legislature. The broad and expansive legislative language used in the UCA, and its consistently liberal construction and application by the courts, would simply have to be ignored in order to reach the result urged by State Farm. Given that broad language and the clear legislative purpose, we cannot hold, as a matter of law, that plaintiffs can state no right to relief under the UCA.

### 2. *The Primary Jurisdiction Doctrine Does Not Bar Plaintiffs' Action*

The judicially created doctrine of "primary jurisdiction" is the flip side of the rule requiring the exhaustion of administrative remedies. (*Farmers Ins. Exchange* v. *Superior Court, supra,* 2 Cal.4th at pp. 390-391.) The latter rule requires that a claim be pursued to the conclusion of its administrative remedy before there can be resort to the courts. The former involves a judicial deference to administrative expertise. The United States Supreme Court explained this distinction in *United States* v. *Western Pac. R. Co.* (1956) 352 U.S. 59 [1 L.Ed.2d 126, 77 S.Ct. 161]: " '*Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone*; judicial interference is withheld until the administrative process has run its course. *'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts,* and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. [Citation.]" (*Id.,* at pp. 63-64 [1 L.Ed.2d at p. 132], italics added.)

"The policy reasons behind the two doctrines are similar and overlapping. The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary). [Citations.] . . . [T]he primary jurisdiction doctrine advances two related policies: it enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws. [Citations.] [¶] No rigid formula exists for applying the primary jurisdiction doctrine [Citation.]. Instead, resolution generally hinges on a court's determination of the extent to which the policies noted above are implicated in a given case. [Citation.] This discretionary approach leaves courts with considerable flexibility to avoid application of the doctrine in appropriate

situations, as required by the interests of justice." (*Farmers Ins. Exchange* v. *Superior Court, supra,* 2 Cal.4th at pp. 391-392, fns. omitted.)

On the other hand, the cumulative remedy clause in Business and Professions Code section 17205 does not preclude application of the primary jurisdiction doctrine but "merely reflects legislative intent that the remedy under [the UCA] not displace any other remedy that might exist." (*Farmers Ins. Exchange* v. *Superior Court, supra,* 2 Cal.4th at p. 395.) Thus, it is a matter within the discretion of the court as to whether a case should be stayed pending administrative action on the issue.

■ We see nothing in this record to suggest that the trial court's decision to reject State Farm's demand for a stay of the action was an abuse of discretion. There is nothing to suggest that any administrative action by the Insurance Commissioner on the allegations of plaintiffs is planned or contemplated. Moreover, it is not at all clear that the commissioner's particular administrative expertise is required with respect to the sale of earthquake coverage. Those allegations do not appear, at least from our reading of the complaint, to suggest that the courts would require the assistance of the Insurance Commissioner's expertise to get to the truth of the matter. Neither of the two criteria discussed by the Supreme Court in *Farmers Ins. Exchange* appears to be satisfied here. There is no indication that the commissioner has at his disposal a " 'pervasive and self-contained system of administrative procedure' . . . to deal with the *precise* questions involved," and there are no complex regulations requiring the agency's special expertise. (*Farmers Ins. Exchange* v. *Superior Court, supra,* 2 Cal.4th at p. 396, italics added.) What we have before us are allegations of fraud and bad faith claims handling. These are both matters with which the courts have had considerable experience. Whatever the authority of the commissioner may be to deal with at least some of these issues, there is no reason to believe that the court would benefit from initial administrative involvement. Thus, the trial court's refusal to apply the primary jurisdiction doctrine and stay this action was not an abuse of its discretion.

### 3. *Plaintiffs Were Properly Joined*

■ Code of Civil Procedure section 378 provides that parties in an action may be joined as plaintiffs where their right to relief arises from the "same transaction, occurrence, or series of transactions or occurrences" and there is "any question of law or fact common to all . . . ." Thus, in order to be joined together as plaintiffs in a lawsuit, plaintiffs must satisfy two

requirements: (1) they must allege the same transaction or occurrence and (2) a common legal or factual question.[11]

This requirement that the right to relief arise from the "same transaction or series of transactions" has been construed broadly so that joinder of plaintiffs is permitted if there is *any* factual relationship between the claims alleged. (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial 1 (The Rutter Group 1995) ¶ 2:211 et seq.)

In *Anaya* v. *Superior Court* (1984) 160 Cal.App.3d 228 [206 Cal.Rptr. 520], over 200 employees and their family members claimed injuries resulting from the employees having been exposed to hazardous chemicals over a period of years at their place of employment. The fact that each employee was not exposed on every occasion any other employee was exposed did not destroy the community of interest linking the plaintiffs. (See also *Parmely* v. *Boone* (1939) 35 Cal.App.2d 517 [96 P.2d 164] [multiple purchasers of securities sued for refund of their money based on the issuer's violation of the Corporate Securities Act]; *Aldrich* v. *Transcontinental Land etc. Co.* (1955) 131 Cal.App.2d 788, 796 [281 P.2d 362] [purchasers in subdivision sued the subdivider for fraud on the same basic misrepresentations to each of them in connection with their purchase].)

We have essentially the same circumstances here. Plaintiffs have alleged that State Farm engaged in a systematic practice to deceive its policyholders with respect to their purchase of earthquake insurance. It is alleged that State Farm, *without adequate* notice of a reduction in the scope of coverage, issued policies of earthquake coverage to replace endorsements to homeowner coverage without a change in premium. Those allegations clearly reflect a claim containing common facts central to the alleged deception.

In addition, the complaint alleges systematic claims handling practices which invaded the rights of plaintiffs as insureds. While not every plaintiff may have been victimized by the same claims handling practice, that is a matter which can be resolved in discovery; and the trial court will always

---

[11]In its entirety, Code of Civil Procedure section 378 provides:

"(a) All persons may join in one action as plaintiffs if:

"(1) They assert any right to relief jointly, severally, or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action; or

"(2) They have a claim, right, or interest adverse to the defendant in the property or controversy which is the subject of the action.

"(b) It is not necessary that each plaintiff be interested as to every cause of action or as to all relief prayed for. Judgment may be given for one or more of the plaintiffs according to their respective right to relief."

retain the right to sever the claims of particular plaintiffs in order to prevent prejudice to State Farm.[12]

We are satisfied that, at least as far as the pleadings are concerned, there has been a proper joinder of plaintiffs under Code of Civil Procedure section 378.

## DISPOSITION

The alternative writ is discharged. The peremptory writ is denied. Our order staying the trial court proceedings is vacated.

Klein, P. J., and Aldrich J., concurred.

A petition for a rehearing was denied June 18, 1996, and petitioners' application for review by the Supreme Court was denied September 4, 1996.

---

[12]Indeed, the trial court has already demonstrated an appropriate sensitivity to this issue (see fn. 4, *ante*).