Filed 12/11/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHRISTINA I. PETERSEN et al., | |
| Plaintiffs and Appellants, | G048387 |
| v. | (Super. Ct. No. 30-2011-00449059) |
| BANK OF AMERICA et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeals from a judgment and an order of the Superior Court of Orange County, Gail Andrea Andler, Judge. Appeal from judgment. Reversed and remanded with directions. Appeal from order. Dismissed. Motion to augment record. Granted.

Brookstone Law, Vito Torchia, Jr., Sasan Behnood, Carlos E. MacManus and Deron Colby for Plaintiffs and Appellants.

Bryan Cave, Stuart W. Price, Trevor Allen and Douglas E. Winter for Defendants and Respondents.

\*          \*          \*

This appeal, after a successful demurrer for misjoinder, tests the limits of California's permissive joinder statute, section 378 of the Code of Civil Procedure.[1] There are no less than *965* plaintiffs listed in the caption of the third amended complaint. Strictly speaking, though, this is a "mass action," not a "class action." Had this case been filed prior to 2005, in all probability it *would* have been filed as a class action. However, in 2005, Congress enacted the Class Action Fairness Act (CAFA) codified at 28 U.S.C. § 1332(d). (See generally *Visendi v. Bank of America* (9th Cir. 2013) 733 F.3d 863, 866-867.) CAFA allows the removal to federal court of state court class actions when there is a class with 100 or more class members, with at least one class member from a different state than at least one defendant, and there is more than $5 million at stake. (Newberg on Class Actions, § 6:14.) That's certainly this case – *if* it had been filed as a class action. And perhaps even if it *hadn't* been so pleaded.

We face two questions of state law: First, despite the rather staggering number of joined plaintiffs, does the third amended complaint allege, to track the statutory language of section 378, the "same . . . series of transactions" that will entail litigation of at least one common question of law or fact?[2] Focusing on the language of the statute and the applicable precedent construing it, we conclude it does. Just a few years after section 378's enactment in 1927, our Supreme Court declared the statute's same-series-of-transactions language is to be construed broadly in favor of joinder. (*Joerger v. Pacific Gas & Electric Co.* (1929) 207 Cal. 8, 19.) It has never retreated from that position.

---

[1]     All undesignated statutory references in this opinion are to the Code of Civil Procedure.

[2]     Here is the complete text of section 378:

"(a) All persons may join in one action as plaintiffs if:

"(1) They assert any right to relief jointly, severally, or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action; or

"(2) They have a claim, right, or interest adverse to the defendant in the property or controversy which is the subject of the action.

"(b) It is not necessary that each plaintiff be interested as to every cause of action or as to all relief prayed for. Judgment may be given for one or more of the plaintiffs according to their respective right to relief."

The third amended complaint alleges that in the mid-2000's, defendant Countrywide Financial Corporation developed a two-prong business strategy to increase its profits: First, Countrywide would use captive real estate appraisers to provide dishonest appraisals that would inflate home prices beyond levels that would otherwise prevail in an honest market; second, Countrywide would induce its borrowers – these plaintiffs in particular – to take loans Countrywide knew they couldn't afford by misleading them as to their ability to pay their loans, including misrepresenting key terms of the loans themselves. Countrywide did this because it had no intention of keeping the loans on its books, but intended to bundle them into saleable tranches and sell them to investors.

The 965 plaintiffs are people who borrowed money from Countrywide in the mid-2000's, to their ultimate chagrin. As we explain below, there are sufficient common questions of law and fact in this case to satisfy section 378, including whether a mortgage lender has a duty to its borrowers not to encourage "high ball," dishonest appraisals and whether Countrywide really had a deliberate strategy of placing borrowers into loans it "knew" – and the word "knew" is a key part of the plaintiffs' pleading – they couldn't afford?

It is important to note at the outset that this is a procedural case, so we express no opinion on the legal or factual *merits* of the plaintiffs' claims vis-à-vis Countrywide's alleged two-prong strategy. To draw a parallel to class action certification procedures, permissive joinder is fundamentally a procedural matter where the focus is *not* on the merits, but on whether there is sufficient commonality to satisfy the requirements of the relevant statute. (See *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1024-1025.)

The applicability of section 378 is the comparatively easy question. Language and precedent dictate the result. The harder question is whether California's procedures governing permissive joinder are up to the task of *managing* mass actions like

3

this one.  Again, we answer in the affirmative.  And again, *Brinker* provides the relevant template.  While we reverse the judgment dismissing all but one plaintiff for misjoinder, we emphasize that on remand the trial court will have to consider a variety of procedural tools with which to organize this case into appropriate and manageable *subclaims* and *subclasses*.  (Cf. *Brinker, supra*, 53 Cal.4th at p. 1004 [existence of subclasses made ascertainment of viability of discrete types of wage and hours claims manageable].)  While the irony of requiring the case to be divided into tranches has not escaped as, we are confident the trial court can handle the task.

## I.  FACTS

A.  *The Third Amended Complaint*

1.  *Form*

The operative complaint here is the third amended one, filed June 2012.  It is over 14 inches tall.  The first page is found on page 5412 of volume 19 of the clerk's transcript and continues on until the proof of service after the last exhibit on page 8554 of volume 29.  Yes, the third amended complaint is 3,142 pages long.

But its organization is more intuitive than that would suggest.  The complaint consists of a main, narrative body of allegations totaling 208 pages, followed by an Appendix A that reads like a series of mini-complaints narrating the (rather similar) loan acquisition experiences of various plaintiffs.  Most of those narratives are variations on the same theme:  A couple went in for a loan; the amount needed was already an inflated figure because of Countrywide's prior price-fixing of the relevant real estate market.  The couple then relied on loan officers at Countrywide to place them in a loan they could afford, but the loan officers hid certain aspects of the loan from them, usually the existence of a balloon payment, sometimes negative amortization, sometimes a change in the terms or calculation of interest rates.  And finally, when the Great Recession hit and the local real estate bubble burst decreasing everybody's home values,

4

these plaintiffs discovered they couldn't afford their loans, couldn't afford to refinance, and sustained various kinds of ensuing financial damage.

Appendix A extends 1771 pages from the end of volume 19 of the reporter's transcript through the middle of volume 25. Then begin the exhibits. Exhibit A consists of a series of emails acquired by plaintiffs, the upshot of which seems to be that there were plenty of people in Countrywide who were expressing misgivings about the firm's various loan "products" and loan strategies in the mid-2000's. Exhibit B consists of a few pages of Countrywide's own published description of its various loan products. (Exhibit B looks like a sales brochure.) Finally come Exhibits C through MMM, which take up the better part of about four volumes of clerk's transcript, extending a total of 1,106 pages. These appear to be a series of files consisting of form foreclosure documents pertaining to a subset of the plaintiffs – namely 90 or so – who are alleging wrongful foreclosure. These documents mostly include notices of default and notices of sale in individual cases.[3]

B. *Content*

While the third amended complaint lists six entities as defendants,[4] they are now, essentially, one defendant – Countrywide as absorbed by Bank of America. That is, all six entities are either directly controlled by Bank of America, which had earlier absorbed Countrywide, or are owned by or affiliated with either Countrywide or Bank of America.[5]

---

[3] The exception is Exhibit Q, which, for some reason, was left blank for future use.

[4] Bank of America, N.A. (B of A), Countrywide Financial Corporation and Countrywide Home Loans (Countrywide), ReconTrust Company, N.A. (ReconTrust), CTC Real Estate Services (CTC) and Landsafe, Inc (Landsafe).

[5] Bank of America took over Countrywide at the beginning of the Great Recession. (See generally Choi, Banktown: *Assessing Blame for the Near-Collapse of Charlotte's Biggest Banks* (2011) 15 N.C. Banking Inst. 423.) The acquisition has been a headache ever since. (See *id*. at p. 453 ["The Countrywide Financial acquisition has subjected Bank of America to large penalties and litigation costs."].)

In this opinion we mostly refer to "Countrywide" as the defendant because, in substance, this complaint primarily targets Countrywide's loan and appraisal practices back in the mid-2000's.

Summarizing the complaint – even the abridged version consisting of just the 208 pages of traditional allegations – presents a challenge. Rhetorical flourishes abound, reminiscent of William Jennings Bryan's famous cross of gold speech from the late 19th Century (which come to think of it, was also about banking).[6] The basic narrative has been recounted in several court decisions,[7] but it can, we think, be summarized in just one sentence: Sometime in the mid-2000's, Countrywide changed the normal gameplan of any home mortgage lender from making a profitable loan that is paid back over time to a new gameplan by which it would make its profits by *originating* loans, then tranching them (chopping them up into little bits and pieces) and selling them on the secondary market to unsuspecting investors who would themselves assume the risk

---

[6] The famous speech even made a specific reference to a "banking conspiracy." In that vein, the third amended complaint includes such exuberant allegations as:

"With greed as their motive, Defendants set out upon a massive and centrally directed fraud by which Defendants placed homeowners into loans which Defendants *knew* Plaintiffs could not afford, abandoned industry standard underwriting guidelines, and intentionally inflated the appraisal value of homes throughout California for the sole purpose of herding as many borrowers as they could into the largest loans possible which Defendants would then sell on the secondary market at inflated values for unimaginable, ill-gotten profit (wildly surpassing the profit they would make by holding the loans), *knowing that their scheme would cause the precipitous decline in values of all homes throughout California*, including those of Plaintiffs herein."

"Like cattle, Plaintiff-borrowers were led to the slaughter by Defendants and their greed."

"Where, as here, corporate greed exceeds the extant and imperative public need for informed disclosure, the law must not sanction."

[7] See *Visendi, supra*, 733 F.3d 863, 866 ["Plaintiffs alleged, among other things, that the institutions' deceptive mortgage lending and securitization practices decreased the value of their homes, impaired their credit scores, and compromised their privacy."]; *Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 599-600 ["Taking issue with industry wide mortgage banking practices, Graham seeks to hold the defendants responsible for the decline in his property value as well as the collapse of the real estate market."].

Perhaps the most succinct statement by a published California court opinion of Countrywide's role in the Great Recession can be found in *Bank of America Corp. v. Superior Court* (2011) 198 Cal.App.4th 862, 865 (*Bank of America 2011*): "By 2005, Countrywide was the largest mortgage lender in the United States, originating over $490 billion in loans in that year alone. Countrywide's founder and CEO, Angelo Mozilo determined that Countrywide could not sustain its business 'unless it used its size and large market share in California to systematically create false and inflated property appraisals throughout California. Countrywide then used these false property valuations to induce Plaintiffs and other borrowers into ever-larger loans on increasingly risky terms.' Mozilo knew 'these loans were unsustainable for Countrywide and the borrowers and to a certainty would result in a crash that would destroy the equity invested by Plaintiffs and other Countrywide borrowers.' [¶] Mozilo and others at Countrywide 'hatched a plan to "pool" the foregoing mortgages and sell the pools for inflated value. Rapidly, these two intertwined schemes grew into a brazen plan to disregard underwriting standards and fraudulently inflate property values . . . in order to take business from legitimate mortgage providers, and moved on to massive securities fraud hand-in-hand with concealment from, and deception of, Plaintiffs and other mortgagees on an unprecedented scale."

In the case before us, the third amended complaint largely echoes the allegations made in *Bank of America 2011*, except the style is bit more rococo.

6

the borrowers couldn't repay.[8]  At root, everything in the third amended complaint is an elaboration on that theme insofar as it directly affected these plaintiff-borrowers from Countrywide.

In order to make the new gameplan work, Countrywide allegedly engaged in an interrelated series of transactions the net effect of which was to saddle the plaintiffs with loans they could not afford.  This series consisted of two identifiable phases:  Phase one was to create an otherwise artificial upward spiral of appreciating property values.  This upward spiral was allegedly accomplished by Countrywide using its own captive appraisal company, defendant Landsafe, to "falsely" inflate all valuations.  The inflated values took on a life of their own which inflated all property values in California.[9]

Phase two was to induce borrowers to take improvident loans.  Normally a prudent lender would want to lend to a creditworthy borrower who could pay back the

---

[8]    Why were investors willing to part with their money so easily?  Basically, the answer is investors felt confident that "the risk" had been prudently dispersed.  Our colleagues in the Fifth District have provided this helpful description of the process:  "In simplified terms, 'securitization' is the process where (1) many loans are bundled together and transferred to a passive entity, such as a trust, and (2) the trust holds the loans and issues investment securities that are repaid from the mortgage payments made on the loans.  [Citation.]  Hence, the securities issued by the trust are 'mortgage-backed.'" (*Glaski v. Bank of America* (2013) 218 Cal.App.4th 1079, 1082, fn. 1; see *Akopyan v. Wells Fargo Home Mortgage, Inc.* (2013) 215 Cal.App.4th 120, 142 [noting that because of securitization, "'thinly capitalized mortgage bankers and finance companies'" were able to "'originate loans for sale on the secondary market.' [Citation.]"]; Engel & McCoy, *A Tale of Three Markets: The Law and Economics of Predatory Lending* (May 2002) 80 Tex. L.Rev. 1255, 1275 [quoted by *Akopyan*].)
    Back to the third amended complaint.  In addition to the – as it turned out, flawed – risk-spreading theory of securitization, the documents alleges investors thought they had insurance for loan defaults by using "credit default swaps," which are forms of insurance against loan defaults.  Paragraphs 142 through 146 of the third amended complaint constitute a Philippic against credit default swaps.  (E.g., paragraph 146 a., "Nobel prize-winning economist George Akerlof predicted that CDS would cause the next meltdown  . . . .")

[9]    Paragraph 98 of the third amended complaint encapsulates this allegation:  "98.  At Countrywide and Defendants' behest, and at their direction, Landsafe Appraisals began systematically inflating the valuations they rendered upon the subject properties of each loan, including the loans of Plaintiffs herein.  As is common knowledge in the real estate industry, appraisers are required to calculate the value of a home based almost entirely on the value of other nearby homes (called comparables aka 'comps').  Defendants, including Countrywide and Bank of America seized on this vulnerability in the system.  Exercising dominion over Landsafe, Countrywide directed, Landsafe to begin systematically inflating the valuations they rendered upon the subject properties of each of their loans (including loans of Plaintiffs herein), knowing that by doing so their falsely inflated valuations would act as comps upon which numerous other appraisers based their valuations of other homes.  LandSafe's and Defendants' inflated appraisals caused other homes to be valued for more than they were worth, which in turn acted as the predicate for even high appraisals, and which, in turn, caused even more homes to be valued for more than they were worth.  The result was a vicious self-feeding exponential cycle, both expected and intended by Defendants; the result was the intentional, systematic, artificial inflation of home values throughout California."  (Italics omitted.)

loan at the stated interest rate. But given Countrywide's new model business plan in which the ultimate payees of the loans were going to be outside investors who would take the hindmost, Countrywide wanted to saddle borrowers with the maximum amount of debt possible – any risk of default would be borne by investors on the secondary market. Meanwhile, Countrywide would pocket loan fees, commissions and profits from the sale of loans after those loans were tranched and securitized. They key to the second prong, i.e., to inducing borrowers into financial improvidence, was to *mislead* them as to loan terms.

The specific misleading statements allegedly made to these plaintiffs are scattered throughout Appendix A, so isolating them all into manageable groups is a chore.[10] Two broad themes, however, can be identified: First, Countrywide loan officers and sales people are alleged to have made broad assurances to each of the plaintiffs that they could "afford" their loans.[11] Second, here and there in Appendix A are allegations that loan representatives from Countrywide did not disclose interest-rate adjustments or loan terms such as when an initial fixed-rate loan suddenly became an adjustable loan.

By the time of the third amended complaint, it had crystallized into four causes of action: intentional misrepresentation, negligent misrepresentation, unfair competition, and wrongful foreclosure. The first three apply to all plaintiffs, the foreclosure claim to only 90 of them. The wrongful foreclosure claim, interestingly enough, presents as pristine a common issue of law as it is possible to imagine: Its theory is that the various individual foreclosures were all unlawful because the eventual trustees who foreclosed on the loan weren't the original agents designated in the loan papers. The

---

[10] As we stress in part II.B. of this opinion, the trial court will have the power on remand to require plaintiff's counsel to undertake that chore in the first instance.

[11] In that regard there are ironic allegations of fraudulent conduct inuring to the ostensible *benefit* of some plaintiffs, who are alleged to have only qualified for their loans because, unbeknownst to them, Countrywide fraudulently overstated their income by physically altering their loan applications. On remand the trial court will have the power to require plaintiffs' counsel to specifically identify all plaintiffs who fall into this subset.

8

claim thus presents a tidy, discrete question of law common to all 90 foreclosure plaintiffs.

C. *Trial Court Disposition*

Defendants demurred to the third amended complaint on the ground of misjoinder of plaintiffs in violation of section 378.[12] The trial court sustained the demurrer without leave to amend and dismissed all the plaintiffs "without prejudice to the rights of the other plaintiffs to file their own complaints," except for first-named plaintiff Wright. The judge said: "The Court understands the importance of these claims to the homeowners, but the problem appears to be that they have been improperly joined in a single case based in the way the Third Amended Complaint has been written. While certainly plaintiff Wright is entitled to go forward with his claims, the language of the complaint drafted by his counsel in its fourth version sets forth separate transactions, loan applications and approvals, with many of the loans originating with third parties. Under the controlling law, CCP section 378, there appears to be a misjoinder of the plaintiffs. The claims of the other homeowners can still go forward, but they will have to file their own complaints."

In January 2013, a judgment of dismissal was entered in favor of defendants against all plaintiffs except for Wright – hence the title of the case before us derives from the *second*-named plaintiff in the caption, Christina Petersen. The dismissal was "without prejudice to the rights of the dismissed Plaintiffs to file their own complaints." The plaintiffs filed two notices of appeal. They – that is, about 800 of the original 965 – filed a notice of appeal from the judgment of dismissal. It is this appeal with which our opinion is mainly concerned.

---

[12] The defendants have filed a motion to augment the record with their memorandum of points and authorities in support of this demurrer, filed on October 5, 2012. The motion is granted. (Cal. Rules of Court, rule 8.155(a).)

9

But back in the second amended complaint, there had been a cause of action for fraudulent concealment. That fraudulent concealment claim had been dismissed on the merits, pursuant to a demurrer. The order dismissing the fraudulent concealment claim is also the subject of a second appeal. We do not address the substance of this second appeal. Because of our disposition of the appeal from the order dismissing all plaintiffs (but one) for misjoinder, there is no final judgment in this case. Accordingly, we dismiss the appeal from the fraudulent concealment cause of action because it would violate the one final judgment rule for us to consider its merits in this proceeding. (See *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1107 [noting policy against piecemeal appeals]; *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 813, fn. 9 [same].) Rather, our focus is on the permissive joinder of such a large number of plaintiffs in this "mass action."

## II. DISCUSSION

A. *Permissive Joinder Under Section 378*

California procedural law is infused with a solicitude, if not an altogether outright preference, for the economies of scale achieved by consolidating related cases into a single, centrally-managed proceeding. Class actions themselves, as set forth in section 382, constitute the most obvious example, since they allow the adjudication of common issues of liability based on the aggregation of claims in one proceeding, usually in a context where adjudicating those claims piecemeal would be impracticable. (See *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 816; accord, *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 457 [observing a "recognized policy favoring" "appropriate class actions"].)

The affinity for economies of scale manifests itself in a number of other procedural contexts. These include the statutory preference in criminal law that favors

10

consolidation of charges against multiple defendants where there is cross-admissibility[13] and rules of court requiring designation of related cases to avoid "substantial duplication of judicial resources if heard by different judges."[14]  It even shows up in the common law doctrine of res judicata and the appellate doctrine of the one final judgment rule.[15]

It is also manifested by the statutory provision before us now – the one that allows for permissive joinder in section 378.  An important aspect of the Legislature's drafting of the statute should not go unremarked:  While many procedural statutes commit discretion to the trial *judge*, this statute commits discretion to the plaintiffs . . . to the *plaintiffs themselves*.  *If* there is a right to relief arising out of the same series of transactions, it is the plaintiffs who get to decide whether to join together in a common action.  Consider the syntax of the opening to section 378 the way the Legislature wrote it:  "All persons *may* join in one action as plaintiffs if:  [¶] (1) *They* assert any right to relief jointly  . . . ."  (Italics added.)  It is the plaintiffs who make the initial decision to file jointly.

In this case, the key words on which that choice turns are "same . . . series of transactions."  As far back as the late 1920's, in the immediate wake of the 1927 enactment of section 378, our Supreme Court noted that the permissive joinder statute reflected the Legislature's desire that joinder be liberally construed so as to prevent the diseconomy of a "multiplicity" of cases.  Said the court in *Joerger v. Pacific Gas & Electric Co., supra,* 207 Cal. at page 19:  "One of the objects of the reformed or code procedure is to simplify the pleadings and conduct of actions, and to permit the

---

[13]     See Penal Code section 954; see generally *People v. Manriquez* (2005) 37 Cal.4th 547, 574 [discussing severance and joinder of charges].

[14]     See California Rules of Court, rule 3.300(a)(4)).

[15]     A point nicely made by Judge Posner in *Arrow Gear Co. v. Downers Grove Sanitary Dist.* (7th Cir. 2010) 629 F.3d 633, 638:  "The doctrine of res judicata serves institutional as well as private interests – interests similar to those served by forbidding piecemeal appeals.  Both res judicata and the final-judgment rule, along with a number of other procedural rules, aim at forcing closely related claims to be consolidated in a single proceeding, whether original or appellate, in order to economize on the expenditure of judicial resources for which litigants don't pay."

11

settlement of all matters of controversy between parties in one action, so far as may be practicable. . . . To permit a joinder where possible makes manifestly for the expeditious disposition of litigation without working hardship to any party defendant, and for this reason statutes relating to joinder *should be liberally construed, unless expressly forbidden*, to the end that a multiplicity of suits may be prevented." (Italics added.)

The high court expressed similar sentiments – again, relatively soon after the statute's enactment – in *Kraft v. Smith* (1944) 24 Cal.2d 124, 129. So did the Court of Appeal. (See *Busset v. California Builders Co.* (1932) 123 Cal.App. 657, 666 [noting joinder statures "should be liberally construed in furtherance of administrative efficiency"]; *Morris v. Duncan* (1936) 14 Cal.App.2d 635, 639; accord, *Coleman v. Twin Coast Newspaper, Inc.* (1959) 175 Cal.App.2d 650, 653 [the joinder statute "should be liberally construed so as to permit joinder whenever possible in furtherance of [its] purpose"].) The Rutter Group treatise on civil procedure before trial has accordingly drawn the obvious conclusion: "The requirement that the right to relief arise from the 'same transaction or series of transactions' is construed broadly. It is sufficient if there is *any factual relationship* between the claims joined (and this tends to merge with the 'common question' requirement, below)." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2014) ¶ 2:211, p. 2-60.1 (hereinafter "Rutter California Civil Procedure Treatise," italics added.)

California section 378 is based on rule 20 of the Federal Rules of Civil Procedure (see *Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 407, fn. 28), and the federal rule has been interpreted to include the same adjuration to liberal application: "Requirements liberally construed: The requirements governing permissive joinder are construed liberally in order to promote trial convenience and to expedite final determination of disputes: 'Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; *joinder of claims, parties and remedies is strongly encouraged*.'" (Schwarzer et al., Cal. Practice Guide:

12

Federal Civil Procedure Before Trial (The Rutter Group 2014) ¶ 7:138, , p. 7-57, quoting *United Mine Workers v. Gibbs* (1966) 383 US 715, 724, italics added.)

Broad construction of section 378 has been exemplified in a series of appellate decisions over the years. The most instructive is *Anaya v. Superior Court* (1984) 160 Cal.App.3d 228. There, multiple joinder was upheld in a case involving widespread exposure to hazardous chemicals. *Anaya* allowed the joinder of 200 plaintiffs on the basis that exposure to a harmful chemical involved "the same series of transactions" even though the plaintiffs were exposed at different times and in different ways. (*Id.* at p. 233.) In *Anaya* there were – as in the case at hand – lots of differences in the individual *damages* sustained by the plaintiffs from the defendant's conduct. But the *Anaya* court pointed out that the key question was the existence of "common questions of law and fact," and not whether, as the defendants had emphasized, there were "differences in the evidence to be presented and in the legal theories to be used by the various plaintiffs." The "point" of section 378, said the court, is to allow joinder where "*any* question of law or fact common to all plaintiffs will arise." And *Anaya* thought "any" means "any." The word was emphasized by the court. (*Ibid.*)

Broad construction was also the watchword in *State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1113.[16] In *State Farm*, multiple joinder was allowed in Northridge earthquake litigation because there was an allegedly fraudulent "systematic" practice of deceiving policyholders. *State Farm* allowed the joinder of 165 Northridge earthquake claimants who asserted that they were the victims of a clever insurance policy switch: Their earthquake endorsements to all risk policies had been replaced with a separate earthquake policy not tethered to the all risk policy, resulting in lower total coverage. (*Id.* at p. 1099.)

---

[16]     In the course of its decision, the *State Farm* panel attempted a definition of unfair competition that the Supreme Court later said was "too amorphous" to provide "guidance to courts and businesses." (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 185.) What *State Farm* held about joinder remains, to use the old phrase from the days of Shepardizing, "good law."

Significantly for our purposes, the plaintiffs in *State Farm* further alleged that after the earthquake they suffered "some 15 different types of 'improper claims handling processes'" which were "'systematically, methodically and generally'" implemented by the insurer. (*State Farm Fire & Casualty Co. v. Superior Court, supra,* 45 Cal.App.4th at pp. 1099-1100.) The diversity of those claims, however, did not prevent joinder, even though they necessarily entailed individualized facts analogous to the individual loan transactions before us now.

In some ways *State Farm* applies a fortiori to certain of the allegations before us now. While there might be a plethora of ways to "low ball" property insurance claims, there are comparatively few ways to "high ball" appraisals – basically, as the third amended complaint alleges, you can simply use non-comparable properties as comparables, or rely on previously-made dishonest appraisals of comparables. And, while bad faith insurance adjustment involves a variety of small tricks and subjective negotiating pressures, here the ways in which defendants allegedly misled borrowers constitute a discrete set of only a few items—mainly unexpected balloon payments and switches from fixed to adjustable rates. If the joinder of a wide variety of claims handling practices was appropriate under *State Farm*, the joinder of various forms of loan impropriety here seems equally correct.

A further manifestation of the broad construction required under section 378 is found in *Moe v. Anderson* (2012) 207 Cal.App.4th 826. In *Moe*, two patients alleged they were victims of separate sexual assaults allegedly committed by a physician. To be sure, joinder was not appropriate as to the physician, since the assaults involved "separate and distinct" events "during separate and distinct time periods." (*Id*. at p. 833.) But the claims against the medical group for which the physician worked was a different story. Joinder was appropriate as to the single employer since the same basic issue of negligent supervision and hiring was common to both (otherwise disparate) plaintiffs, and would involve the same evidence against a single defendant. The court said: "Thus, as

14

was the case in *Anaya*, plaintiffs have asserted a right to relief arising out of the same series of transactions. So too are there common issues of law or fact. The *same evidence* with respect to Healthworks' hiring and supervision of Anderson *will need to be adduced in separate lawsuits if joinder is not allowed*." (*Id.* at p. 836, italics added.) Needless to say, in the case before us there is much in the way of common evidence and theories of liability and much of the same evidence will have to be repeatedly produced if joinder is not allowed. Indeed, we shudder to think of the duplication of effort if even a dozen of the 800-or-so plaintiffs who have brought this appeal have individual trials on liability issues.

Finally, *Adams v. Albany* (1954) 124 Cal.App.2d 639 is similarly instructive. There, joinder of no less than 40 sets of homebuyers (recent war veterans) was held proper. Even though the defendant argued its alleged fraudulent scheme involved torts that took place at different times and places, and even though the evidence as to one house would have no probative value as to any other house, the appellate court invoked the "series of transactions" language from section 378 and said it was enough that defendant was alleged to have engaged in a conspiracy to defraud the veterans by selling them substandard housing. As here, *Adams* is a case where the alleged "business plan" of the defendant was common to multiple defendants, even if their specific damages might vary.

In light of *State Farm*, *Anaya*, *Moe* and *Adams*, it would be a major departure from California case law construing section 378 for us to uphold the trial court's demurrer for misjoinder in this case. This case is merely a quantitatively – not qualitatively – larger version of those four, particularly *State Farm* and *Adams*.

Here, we have already identified the two core aspects of the common plan alleged in the third amended complaint that necessarily will entail common evidence (1) whether Countrywide deliberately encouraged dishonest appraisals and (2) whether Countrywide encouraged its loan officers to conceal loan terms. These two aspects

15

devolve into several questions of law or fact bearing on liability.  Here are four that come readily to mind:  (a) whether Countrywide had a conscious business plan to pressure or otherwise unduly influence appraisers to dishonestly inflate appraisals; (b) if it did, whether even such dishonest appraisals could have the cumulative effect of inflating real estate markets in a way that might have caused buyers and/or borrowers in those markets to pay more, or borrow more, than they otherwise might have; (c) even if they did, whether such marginally extra borrowed money constitutes cognizable damages under some theory of law; and (d) whether a failure to expressly warn buyers or borrowers about such key terms of a written loan agreement, such as changes from fixed to adjustable rates, or the need to make a balloon payment at the end are actionable under some theory of fraud or unfair business practice.

We emphasize again that this case involves essentially only one lender, Countrywide, operating in conjunction with its captive appraisal agents.  While Countrywide cites a number of federal cases that concluded there had been misjoinder, these federal cases merely make the point that genuinely *multiple* defendants do not fall within the federal permissive joinder rule.[17]

We further emphasize that our conclusion joinder is permissible is based on commonality regarding liability, not damages.  There is a direct parallel here (again) to class actions.  While the individual damages among these 965 plaintiffs of course vary widely, that's not the salient point.  (See *Brinker, supra,* 53 Cal.3d at p. 1022 ["'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually

---

[17]    *Visendi v. Bank of America, supra,* 733 F.3d at p. 866 [misjoinder where 137 plaintiffs sued 25 financial institutions]; *Barber v. America's Wholesale Lender* (M.D.Fla. 2013) 289 F.R.D. 364, 365 [misjoinder where 18 different borrowers sued at least 9 different lenders]; *Abraham v. Am. Home Mortg. Servicing* (E.D.N.Y 2013) 947 F.Supp.2d 222, 228-229 [misjoinder where several hundred current and former homeowners sued several dozen mortgage originators and servicers].)

16

prove their damages.' [Citations.]"].)  The salient point is that *liability* is amenable to mass action treatment.

Finally, we must observe that two overall policies of the law are served by joinder in this instance.  One is access to justice. To require these plaintiffs to file separately not only clogs up the courts, but also deprives them of economies of scale otherwise available under section 378, particularly in regard to the clearly common proof bearing on Countrywide's alleged two-pronged scheme to both fix prices and mislead borrowers as to loan terms.  As far as we can tell, the same experts and whistleblowers will be common to all causes of action based on variations of misrepresentation or unfair competition.

The second is the conservation of judicial resources.  There is an obvious burden to the trial court if joinder is *not* allowed.  Appendix A shows that there are some 800 or so potential individual actions out there (assuming that 165 of the original 965 who didn't join this appeal no longer care), waiting to come trooping in as single snipers, not as one ready-made, manageable battalion.  It wouldn't take many such actions before the trial court would be faced with the administrivial task of setting up a grand coordinated action, which in all probability – because it will involve different plaintiffs and different actions – will be harder to manage than this one, single action.  (Cf. §§ 404 [authorizing coordination]; Stats. 1992, ch. 696, subd. (b)(1)(C), p. 91970 ["The Legislature further finds and declares that:  [¶] . . . 'Scarce judicial resources must be

17

used in an efficient manner . . . .'"].)[18] Put another way, mass joinder here holds the promise of actually *decreasing* trial court case management time. Unless we adopt the cynical view that requiring each plaintiff to proceed against the corporate defendants will make their cases go away, we have to consider this aspect of the case.

B. *Management*

And in regard to administrative tasks ahead, we must offer what we can in the way of guidance for the trial court on remand. We say "we must" because we believe sending this 3,000-plus page third amended complaint case back to the trial court without guidance would be nothing less than oppressive. If we're going to send Moby Dick back to the trial court, we should at least provide a harpoon or two. Countrywide's argument that the sheer heft of this 965-plaintiff action is unduly burdensome *does* carry some force. But we think the law of California procedure strikes a golden mean here. On the one hand, it is unfair to these plaintiffs to deprive them of the commonalities of proof and witnesses inherent in their basic theory against Countrywide. As noted, the same experts and whistleblowers can be anticipated to provide evidence for all these plaintiffs. On the other hand, it is unfair to Countrywide to saddle it with the amorphous, inchoate heap of allegations that currently constitutes the third amended complaint as drafted and structured. So let us be plain: On remand the trial court will have the power to require plaintiffs' counsel to whip the third amended complaint's desultory and scattered allegations against Countrywide into a tightly-structured set of manageable subclaims and

---

[18] There is a doctrinal interrelatedness in the issues of judicial economy and coordination that can cut in two directions at once. Section 404 is part of the general solicitude in California procedural law – also reflected in section 378, our state's permissive joinder statute – that seeks the benefit of the economies of scale from the joint adjudication of common questions of law or fact. (See also § 404.1 [referencing convenience and "efficient utilization of judicial facilities and manpower" of coordination of actions involving common questions of law or fact"].) But this solicitude has its twists: Recently, in *Corber v. Xanodyne Pharm., Inc.* (9th Cir. 2014) ___ F.3d ___ [2014 U.S.App.LEXIS 21806], the Ninth Circuit, in an en banc decision, equated requests for coordination by plaintiffs of more than 40 state court actions involving an allegedly defective drug as the equivalent of a request for joint trials, which subjected those actions to removal under CAFA. It is an interesting question, given the overlap in "common question" standards that govern both permissive joinder and coordination in California, whether it will be even possible for the plaintiffs in this case to avoid removal under CAFA. To put it plainly: Is filing an action so large that it is unmanageable *without* coordination the de facto equivalent of a request the cases be tried jointly ala *Corber*? That's a question we'll leave to the federal courts to sort out.

18

subclasses. Our decision does not require it to commence jury selection at Anaheim Stadium.[19]

Injustice, said Aristotle, can consist in treating unequals equally or of treating equals unequally. So, just as there is a procedural solicitude for consolidation to assure access to justice that favors joinder and class actions, there is corresponding contrapuntal recognition in procedural law that trial courts sometimes need to categorize and subdivide claims and classes to treat them effectively. We find it in such procedures as the discretion of trial courts to sever arbitral claims from non-arbitral ones (e.g., *Doan v. State Farm General Ins. Co.* (2011) 195 Cal.App.4th 1082, 1098-1099), the authority to order separate trials in order to avoid prejudice (§ 1048) and – important for our purpose here – the ability to organize class actions into appropriate subclasses. (See generally *Brinker, supra*, 53 Cal.4th 1004 [use of subclasses allowed court to ascertain validity of some claims and invalidity of others]; *Aguiar v. Cintas Corp. No. 2* (2007) 144 Cal.App.4th 121, 125 ["Because the complexities of the case on which the trial court relied to find class certification inappropriate can be addressed by the use of subclasses . . . we reverse the order denying certification and remand the matter with directions for the trial court to certify two subclasses of Cintas employees . . . ."]; *Canon U.S.A., Inc. v. Superior Court* (1998) 68 Cal.App.4th 1, 5 [noting obligation of trial court to consider possible creation of subclasses in context of class certification].)

The trial court has the authority to require the various classes and claims found in the third amended complaint be properly and digestibly organized. This is easily a "complex" action under rule 3.400(c)(5) [claims involving mass torts] of the California Rules of Court. As such, Judicial Administration standards contemplate the

---

[19]     Consider, for example, two basic tools of early-case civil procedure that are useful in transforming otherwise amorphous, sprawling pleadings into tight, manageable sets of claims: The special demurrer for uncertainty (§ 430.10, subd. (f)) and the motion to strike irrelevant, false or improper matter (§ 436). In this case it will obviously be awhile before this complaint is ready for the prime time of a trial.

19

designation of one judge who will have the power to identify phases for the litigation and set time limits on those phases, and adjudicate legal and evidentiary sub-issues pretrial.[20]

As stated earlier, today's decision is also without prejudice as to whether CAFA applies. (Cf. *Bullard v. Burlington Northern Santa Fe Ry. Co.* (7th Cir. 2008) 535 F.3d 759 [CAFA removal upheld]; *Koral v. Boeing Company* (7th Cir. 2011) 628 F.3d 945, 947 [CAFA removal premature, but noting "a mass action is a form of class action"] and *Romo v. Teva Pharms. USA, Inc.* (9th Cir. 2013) 731 F.3d 918, 924 [no CAFA removal of state court coordinated proceedings because of absence of proposal for joint trial].) Likewise, it is without prejudice to either side to bring a class certification motion. (See Cal. Rules of Court, rule 3.764(a)(1) [any party may move to certify a class].)

Finally, because we remand the case back to the trial court, there is, as yet, no final judgment, so we are dismissing the appeal from the order dismissing the cause of action for fraudulent concealment. Obviously we express no opinion on the merits of that cause of action now.

## III. DISPOSITION

The judgment dismissing those plaintiffs who have filed notices of appeal in this action is reversed, and the case remanded with directions to conduct further proceedings not inconsistent with this opinion. Because this is an interlocutory appeal without final disposition of the cause, we do not award appellate costs now. Rather, we

---

[20] We have tried here to give a little help in that regard but we do not flatter ourselves that we have done more than carry some wood to the carpenter. (See generally *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 966; *Lu v. Superior Court* (1997) 55 Cal.App.4th 1264 [approving discovery referee for complex construction defect litigation]; *Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277, 284-285 ["A court has inherent equity, supervisory and administrative powers, as well as inherent power to control litigation and conserve judicial resources. . . . Courts can conduct hearings and formulate rules of procedure where justice so demands."]; § 187 ["if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code"]; Cal. Standards Jud. Admin., § 19; Rutter California Civil Procedure Treatise, *supra*, ¶ 12:47, pp. 12(l)-14 to 12(l)-14.1.)

authorize the trial judge, at the conclusion of proceedings, to award the appellate costs of this appeal as he or she believes serve the interests of justice.


BEDSWORTH, ACTING P. J.

I CONCUR:


THOMPSON, J.

FYBEL, J., dissenting.

I respectfully dissent. I would affirm the correct decision of the trial court. The result of the majority's decision to reverse the trial court will be as breathtaking as it is legally unsupported. The majority is approving the joinder of the claims of some 818 plaintiff home loan borrowers with the claims of the first named plaintiff, John P. Wright, into a single massive lawsuit.[1] This vast joinder of borrowers' claims is unprecedented under California and federal law.

Joining the claims of so many plaintiffs not only is unprecedented, but also is not justified by the relevant standards and principles governing joinder. Code of Civil Procedure section 378, subdivision (a)(1) (section 378(a)(1)) permits joinder only if two requirements are satisfied: (1) the claims arise out of the same transaction or occurrence *and* (2) there is a common legal or factual question. Plaintiffs' third amended complaint (the Complaint) does not come close to satisfying the standards for joinder under section 378(a)(1).

Plaintiffs' claims did not arise out of the same transaction or occurrence; rather, they arose out of over 1,000 separate and distinct loan and loan modification transactions involving different borrowers, and many third party originators and lenders. The loan transactions were made at different times over a six-year period; some loans were purchase money loans, while other loans refinanced existing ones. Each loan

---

[1] According to defendants Bank of America, N.A. (B of A), Bank of America Corporation, Countrywide Financial Corporation (Countrywide), Countrywide Home Loans, Inc. (Countrywide Home Loans), ReconTrust Company, N.A., CTC Real Estate Services, and LandSafe, Inc. (collectively, Defendants), 818 out of 964 dismissed plaintiffs appealed. I refer to the 818 appellants as Appealing Plaintiffs and refer to all plaintiffs named in the third amended complaint, including those who did not join in this appeal, as Plaintiffs.

1

transaction was secured by a different parcel of real property in California and involved a different appraisal. The loans had various terms and were at different interest rates; some were fixed rate loans, while others were variable rate loans. Not all lenders were the same. Each loan transaction involved different loan brokers and agents, who made different representations to each plaintiff.

The majority opinion is in error for the following five principal reasons:

1. *Each Loan Transaction Is Distinct*. The majority opinion, at a minimum, oversimplifies the Complaint's allegations in an attempt to find commonality amongst the diverse claims of 818 Appealing Plaintiffs. Although the Complaint alleged Defendants engaged in a scheme to defraud, each of these borrowers entered into a different loan transaction secured by a different parcel of real property and supported by a different appraisal. The majority is mistaken in asserting the lender was the same for each loan, as many lenders were third parties who have not been named as defendants. For many of the Appealing Plaintiffs, the Complaint and its attachments do not include basic information about the loan transaction.

2. *Issues of Liability Are Not Subject to Common Proof*. The majority opinion asserts that the issues of liability are subject to common proof and individual questions of damages can be addressed through trial court management. The Complaint itself reveals those assertions to be incorrect. As I will explain in detail, Plaintiffs did not allege that a common, uniform set of misrepresentations was made to each of them. Nor have Appealing Plaintiffs argued in any of their briefs or at oral argument that uniform representations were made. Thus, to recover on the cause of action for intentional misrepresentation or the cause of action for negligent misrepresentation, each and every plaintiff—yes, each one of them—will have to submit evidence to prove liability and damages. Likewise, each of the 90 plaintiffs asserting wrongful foreclosure must

2

individually prove the facts specific to him or her establishing that foreclosure procedures were not followed.

Resolving the claims of all 818 Appealing Plaintiffs in a single lawsuit, therefore, definitely would not promote judicial economy and fairness as required by law; quite the contrary, the "megasuit" mandated by the majority promises to be an unjustified administrative nightmare.

3. *Analogous Case Law Is Against Joinder*. For good reason, courts which have addressed the issue of joinder of borrowers' claims in the same circumstances presented in this lawsuit have consistently held such attempts at joinder to be improper. In section III., I discuss 11 opinions decided by the United States Courts of Appeals, including the Ninth Circuit, and United States District Courts, including the Central District and Northern District of California. All of them conclude that plaintiff borrowers, who made the same claims as Appealing Plaintiffs, were misjoined because each loan was a separate transaction. Federal law on joinder is the same as California law on joinder. Both in its analysis and conclusion, the majority opinion is in conflict with all of those cases. Instead, the majority relies on the principle of broad construction and uses that principle to stretch section 378(a)(1) past its breaking point. The California appellate cases which, the majority claims, exemplify the application of the principle of broad construction in upholding joinder, arose in very different contexts and had far different facts from those presented in this case. In none of those cases did joinder actually depend on broad construction of section 378(a)(1).

4. *This Is Not a Class Action*. The majority opinion essentially recasts the Complaint as a class action. Let's be plain upfront: Plaintiffs did not file the Complaint as a class action and the Complaint includes no class or subclass allegations. Plaintiffs did not ask for class certification. The question before the trial court—whether the 965 (including Wright) plaintiffs were misjoined—was an all-or-nothing proposition.

3

Appealing Plaintiffs never argued here or in the trial court that this lawsuit should be treated as a class action or divided into subclasses or subgroups. Indeed, in direct response to questions about subclasses posed at oral argument by my colleagues, Appealing Plaintiffs' counsel flatly stated the only issue presented was whether Plaintiffs' claims were properly joined, not whether subclasses could or should be created.

The majority opinion's treatment of the Complaint is reminiscent of the famous story told by Abraham Lincoln. A boy was asked how many legs his calf would have if he called its tail a leg. The boy replied, "'Five.'" The correct answer, of course, is four. Calling a calf's tail a leg "would not *make* it a leg." (Rice, Reminiscences of Abraham Lincoln by distinguished men of his time (rev. ed. 1909) p. 242.) Likewise, treating a lawsuit as a class action does not make it one. The issue presented to us is whether the 818 Appealing Plaintiffs were properly joined under section 378(a)(1), not whether or under what circumstances Appealing Plaintiffs should be treated as a class.

5. *This Case Should Not Be Treated as a Class Action.* The majority advises the parties to use subclasses—a procedure peculiar to class actions—and draws a "direct parallel" with class actions based on supposed commonality on issues of liability, with only damages to be individually calculated. (Maj. opn., *ante*, at pp. 16-17.) The majority states its decision is without prejudice to whether the Class Action Fairness Act of 2005, 28 United States Code section 1332(d) (CAFA) applies. (Maj. opn., *ante*, at p. 20.) The majority is telling the trial court and Appealing Plaintiffs this litigation really should be treated as a class action, which could then be divided into the subissues and subclasses revealed by the majority's reading of the Complaint. How can there be subclasses without a class?

4

While counsel for Defendants will be surprised by the majority's approach, no one will be more surprised than counsel for Appealing Plaintiffs, who have disclaimed the premise on which the majority opinion rests. When asked at oral argument about the possibility of subclasses, Appealing Plaintiffs' counsel stated the issue presented was whether the trial court erred by denying joinder. The majority erroneously calls this lawsuit a "'mass action,'" (maj. opn., *ante*, at p. 2), but that is a term found in CAFA, 28 United States Code section 1332(d)(11)(B), and Defendants chose not to remove this action to federal court.[2]

The plaintiffs in any civil litigation, including the ones in this case, are deemed to be the masters of their complaint (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1202) and are no less the masters of their litigation strategy. Our system is, after all, an adversarial one. Appealing Plaintiffs are represented by able counsel with years of civil litigation experience who made the strategic decisions to draft the Complaint as they did and to pursue Plaintiffs' claims in a particular way. Plaintiffs chose not to bring a class action and chose not to separate themselves into subclasses or subgroups. It is not appropriate for us to second-guess those decisions and give unsolicited advice purporting to tell Appealing Plaintiffs the best way for them to draft their own complaint and pursue their own claims.

It bears repeating that the only issue before us on the appeal from the judgment of dismissal is whether the statutory requirements for joinder are satisfied based on the allegations of the Complaint. The trial court, after fully considering the relevant factors and issues, was correct to sustain, without leave to amend, Defendants' demurrer to the Complaint. Any Appealing Plaintiff is free to file his or her own lawsuit, including a representative action under California's unfair competition law.

---

[2] A "mass action" is deemed to be a class action removable to federal court if it meets specified requirements. (28 U.S.C. § 1332(d)(11)(A).)

5

# I.

## ALLEGATIONS

### A.

### Overview of the Complaint

The Complaint is 210 pages in length, and, in addition, has a 1,772-page appendix and attaches 1,259 pages of title and loan documents.  Allegations specific to each plaintiff were made in appendix A to the Complaint.

The Complaint asserted four causes of action:  (1) intentional misrepresentation, (2) negligent misrepresentation, (3) unfair competition in violation of Business and Professions Code section 17200 et seq., and (4) wrongful foreclosure.  All Plaintiffs sought damages for intentional misrepresentation and negligent misrepresentation.  Of the 965 Plaintiffs, 90 were parties to the wrongful foreclosure cause of action.

### B.

### The Parties

1. *Plaintiffs*

All 965 Plaintiffs are California residents.  The Complaint alleged each plaintiff "borrowed money from one or more of the Defendants or its subsidiaries or affiliates or successors and assigns between January 1, 2003, and December 31, 2008, secured by a deed of trust on his or her California real estate(s)" and "one or more of the Defendants have acted as Servicer or some other control or capacity over processing the loan."

Appendix A and the exhibits show Plaintiffs' claims arose from about 1,100 loan and loan modification transactions over the six-year period from January 1, 2003 through December 31, 2008.  As to 154 plaintiffs, appendix A to the Complaint did

6

not identify basic information such as the lender, the location of the secured real property, the amount of the loan, or the status of the loan.

2. *Defendants*

Countrywide and its founder and chief executive officer, Angelo Mozilo, were alleged to have devised the massive fraudulent scheme that is the subject of the Complaint. Countrywide Home Loans was the mortgage banking subsidiary of Countrywide.

LandSafe, Inc., was a wholly owned subsidiary of Countrywide. The Complaint alleged, "Land[S]afe Appraisals is a division of Land[S]afe, which conducted the appraisals of Plaintiffs."

B of A acquired Countrywide in 2008. Countrywide was merged into B of A, which absorbed and took over Countrywide's operations and employees. The Complaint alleged B of A conducted the business formerly conducted by Countrywide and "ha[s] continued the unlawful practices of Countrywide since October 31, 2007, including . . . writing fraudulent mortgages."

ReconTrust Company, N.A., was a wholly owned subsidiary of B of A and acted as trustee under the deeds of trust securing real estate loans held or serviced by B of A. The Complaint alleged, "B of A . . . and the other Bank Defendants . . . have regularly used ReconTrust to foreclose, as trustee with power of sale, trust deeds on California realty." CTC Real Estate Services was alleged to have "acted alongside and in concert with B of A in carrying out the concealment described herein . . . ."

## C.

### General Allegations

The underlying theory of the Complaint is Defendants ceased acting as conventional lenders and instead "morphed into an enterprise engaged in systematic fraud upon its borrowers." The Complaint alleged that Defendants engaged in "a massive and centrally directed fraud" by which they placed homeowners into loans which Defendants

7

knew they could not afford (and on which the homeowners inevitably would default), abandoned industry-standard underwriting guidelines, and engaged in a market-fixing scheme by using inflated appraisals to artificially raise home prices throughout California.

According to the Complaint, the reason why Defendants were able to carry out this scheme was that they securitized the loans and sold them in bulk to "unsuspecting" third party investors at a hefty profit. Since Defendants intended to sell the loans, rather than hold them and earn profit from the interest generated, they allegedly no longer had an incentive to follow, and intentionally abandoned, sound underwriting standards. Defendants allegedly used intentionally inflated appraisals to justify the size of the loans, and the artificially inflated real estate values in turn allowed Defendants to continue to generate more inflated loans that could be securitized and sold in bulk to investors.

Not all loans were originated by Defendants, and the Complaint alleged, with no factual detail, that unnamed third party banks and lenders "acted at the behest and direction of the Countrywide Defendants, or agreed to participate—knowingly or unknowingly—in the fraudulent scheme."

**D.**

**Causes of Action of the Complaint**

1. *Intentional Misrepresentation*

In the first cause of action, for intentional misrepresentation, Plaintiffs alleged Defendants, "through Defendants' securities filings, speeches, advertisements, public utterances, websites, brokers, loan consultants, branches, communications with clients, and other media," made a series of partial misrepresentations creating a duty to "speak the whole truth" and to disclose material facts. These eight partial misrepresentations included:

8

1. The borrower's loan payment would be for a specified sum, "when in reality such payment was only available for a limited undisclosed period of time and would then drastically increase."

2. The amount of payments under the loan would be "constant" and the borrower would be able to afford those payments, when in reality the loan payments later would increase and the borrower would not be able to afford those payments.

3. The borrower qualified for the loan, when in reality the borrower only qualified because Defendants falsified income and asset documentation.

4. Countrywide loaned money in conformance with its underwriting guidelines, and that its lending standards were safe.

5. The borrower's loan payment would cover both principal and interest, when in reality the payments would not cover principal and would not cover the minimum interest on the loan resulting in deferred interest.

6. By making the minimum payment on an adjustable rate mortgage loan (ARM), the borrower might defer interest when, in reality, making the minimum payment definitely would result in deferred interest.

7. Payment schedules created the false impression that by making the recommended payments, borrowers would not negatively amortize their loans.

8. By making the minimum payment during the initial interest rate period of an ARM, borrowers would be paying both interest and principal, when in reality they would be paying neither, resulting in negative amortization.

In addition to those partial misrepresentations, the Complaint alleged Defendants made a series of affirmative misrepresentations "through Defendants' securities filings, speeches, advertisements, public utterances, websites, brokers, loan consultants, branches, and communications with clients and other media." The 13 affirmative misrepresentations included:

1. The borrowers could afford their loans.

9

2. Defendants' calculations confirmed that the borrowers could afford their loans and could "shoulder the additional debt resulting from Defendant[s'] loans, in light of Plaintiffs' other debts and expenses."

3. A borrower's qualification for a loan was the same as being able to afford a loan.

4. By making the minimum payment on an ARM, the borrower would not be deferring interest and would be paying both principal and interest.

5. "[T]he value arrived at by Defendants' appraisals of Plaintiffs' property was indeed the true value of Plaintiffs' property."

6. "[T]he value arrived at by Defendants' appraisals of Plaintiffs' property was sufficient to justify the size of the loan they were being given."

7. The actual terms of the loans, including the interest rate, whether the loan was variable or fixed, the duration of any fixed period, and the inclusion of a prepayment penalty.

8. Defendants followed their own underwriting guidelines and made loans only to qualified borrowers.

9. Defendants were financially sound.

10. "Defendants were engaged in lending of the highest caliber."

11. The loans offered by Defendants were "safe and secure."

12. The borrowers would be able to refinance their loans at a later time.

13. Defendants would modify the borrowers' loans.

The Complaint alleged that in justifiable reliance on these partial and affirmative misrepresentations, Plaintiffs entered into loan and mortgage transactions into which they otherwise would not have entered, and which they could not afford from the outset or could not afford once the variable rate feature or balloon payment took effect. The Complaint did not allege the claimed 21 misrepresentations, or any combination of them, were uniformly made to all 965 Plaintiffs. As shown by appendix A and the

10

exhibits to the Complaint, each of these loan and loan modification transactions was distinct.

2. *Negligent Misrepresentation*

The second cause of action, for negligent misrepresentation, was based on the same misrepresentations that formed the basis for the intentional misrepresentation cause of action, but alleged those misrepresentations were made negligently.

3. *Unfair Competition*

The third cause of action asserted unfair competition in violation of the unfair competition law, Business and Professions Code section 17200 et seq. The unfair competition cause of action alleged Defendants' alleged massive scheme of fraud and Defendants' fraudulent misrepresentations to Plaintiffs were fraudulent, unfair, and violated "numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce."

In the unfair competition cause of action, Plaintiffs alleged they suffered financial injury including "loss of equity in their houses, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including . . . attorneys' fees and costs." As a remedy for unfair competition, Plaintiffs sought injunctive relief and restitution.

4. *Wrongful Foreclosure*

Ninety plaintiffs asserted a fourth cause of action for wrongful foreclosure in violation of Civil Code section 2924. The Complaint set forth the basis for the wrongful foreclosure claim for each of these 90 plaintiffs.

**II.**

**Legal Standards Governing Joinder**

Code of Civil Procedure section 378 provides that parties to an action may be joined as plaintiffs if their right to relief arises from the "same transaction, occurrence,

11

or series of transactions or occurrences" and there is "any question of law or fact common to all." (§ 378(a)(1).)[3] "Thus, in order to be joined together as plaintiffs in a lawsuit, plaintiffs must satisfy two requirements: (1) they must allege the same transaction or occurrence *and* (2) a common legal or factual question." (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1112-1113 (*State Farm*), italics added, disapproved on another ground in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 184-185.)

Code of Civil Procedure section 378 is based on rule 20 of the Federal Rules of Civil Procedure (28 U.S.C.) (Rule 20). (*Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 407, fn. 28.) Rule 20(a)(1) provides: "(1) *Plaintiffs*. Persons may join in one action as plaintiffs if: [¶] (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and [¶] (B) any question of law or fact common to all plaintiffs will arise in the action."

In determining what constitutes a "transaction" or "occurrence" under Rule 20(a)(1)(A), federal courts have looked to rule 13(a) of the Federal Rules of Civil Procedure (28 U.S.C.), which governs compulsory counterclaims. (*Alexander v. Fulton County, Ga.* (11th Cir. 2000) 207 F.3d 1303, 1323, overruled on another ground in *Manders v. Lee* (11th Cir. 2003) 338 F.3d 1304, 1328, fn. 52.) "For the purposes of Rule 13(a), '"[t]ransaction" is a word of flexible meaning. It may comprehend a series of

---

[3] In full, Code of Civil Procedure section 378 states: "(a) All persons may join in one action as plaintiffs if: [¶] (1) They assert any right to relief jointly, severally, or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action; or [¶] (2) They have a claim, right, or interest adverse to the defendant in the property or controversy which is the subject of the action. [¶] (b) It is not necessary that each plaintiff be interested as to every cause of action or as to all relief prayed for. Judgment may be given for one or more of the plaintiffs according to their respective right to relief."

12

many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.'" (*Alexander v. Fulton County, Ga.*, *supra*, at p. 1323, quoting *Moore v. New York Cotton Exchange* (1926) 270 U.S. 593, 610.)

The ultimate consideration in assessing joinder of plaintiffs under Rule 20 is whether the claims are so logically connected that resolving all issues in one lawsuit would promote judicial economy and fairness. As phrased by the United States Court of Appeals for the Second Circuit: "In determining whether a claim 'arises out of the transaction . . . that is the subject matter of the opposing party's claim', this Circuit generally has taken a broad view, not requiring 'an absolute identity of factual backgrounds . . . but only a logical relationship between them.' [Citation.] This approach looks to the logical relationship between the claim and the counterclaim [citation] and attempts to determine whether the 'essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.' [Citation.]" (*U.S. v. Aquavella* (2d Cir. 1979) 615 F.2d 12, 22; see *Abraham v. American Home Mortgage Servicing, Inc.* (E.D.N.Y 2013) 947 F.Supp.2d 222, 228-229 (*Abraham*); *Peterson v. Regina* (S.D.N.Y. 2013) 935 F.Supp.2d 628, 637.) "[T]he central purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits." (*Alexander v. Fulton County, Ga.*, *supra*, 207 F.3d at p. 1323; see *Coughlin v. Rogers* (9th Cir. 1997) 130 F.3d 1348, 1351 ["Rule 20 is designed to promote judicial economy, and reduce inconvenience, delay, and added expense."].)

## III.

### Plaintiffs' Claims Did Not Arise from the Same Transaction or Occurrence or Series of Transactions or Occurrences.

Appealing Plaintiffs assert that all of their claims for relief arise from the same transaction or occurrence or series of transactions or occurrences because "the

13

gravamen" of their lawsuit is "the fraudulent scheme common to all Plaintiffs" and "the harms alleged by Plaintiffs herein were the common result of Defendants['] practices and policies." (Boldface omitted.) A demurrer is treated as admitting all material facts properly pleaded (*Moe v. Anderson* (2012) 207 Cal.App.4th 826, 830-831 (*Moe*)) and, therefore, the facts alleged of a massive and systematic fraud perpetrated by Defendants are deemed true.

But, on its face, the Complaint, along with the appendix and exhibits, shows Plaintiffs' claims arose from over 1,000 separate and distinct loan and loan modification transactions. The appendix and the exhibits disclose the transactions involved different borrowers, a number of third party originators and lenders, and many different loan brokers and officers in different locations.

The loan transactions were made at different times over a six-year period stretching from 2003, a time of prosperity, through 2008, at the peak of the financial crisis. Some loans were purchase money loans, while other loans refinanced existing ones. Each loan transaction was secured by a different parcel of real property in California and involved a different appraisal. The loans had various terms and were made at different interest rates; some were fixed rate loans while others were variable rate loans. As Defendants point out, as to 154 plaintiffs, the Complaint did not identify the lender, the location of the secured property, the loan amount, the type of loan, or the status of the loan.

Contrary to the majority's assertion, not all Appealing Plaintiffs had the same lender. Many had third party lenders, with names such as Millennium Mortgage Corp., BrooksAmerica Mortgage Corporation, Global Lending, Maverick, Hilsborough Corporation, PacificPan Mortgage, J&R Lending, Inc., and Dynamic Mortgage Financial Corporation.

14

The claims of each plaintiff arose out of discrete facts and circumstances related to that plaintiff's particular loan transaction. Such claims are not connected to each other and not susceptible to common proof.

Plaintiffs have alleged three causes of action which seek damages: intentional misrepresentation, negligent misrepresentation, and wrongful foreclosure.[4] Significantly, Appealing Plaintiffs did not allege, nor do they argue, that Defendants uniformly made the same misrepresentations to each plaintiff by the same person, or even through the same medium. Instead, Plaintiffs broadly alleged Defendants made misrepresentations through their "securities filings, speeches, advertisements, public utterances, websites, brokers, loan consultants, branches, and communications with clients, and other media."

Which misrepresentations, if any, were made to a particular plaintiff, by whom, and through which medium, would have to be proven individually. To establish liability for intentional misrepresentation and negligent misrepresentation, each of the more than 818 Appealing Plaintiffs would have to prove the specific representations made to him or her, prove the representation was false, and prove reliance on that representation. "[I]solating" (maj. opn., *ante*, at p. 8) the various representations into thematic subgroups or "discrete, manageable categories" (*ibid.*, fn. 12), as the majority directs Plaintiffs to do, would not solve the proof problem.

For those reasons, the majority is, I believe, mistaken in concluding this is a case in which issues of liability are subject to common proof, leaving only damages to be individually proven and calculated. Even were the allegations that Defendants perpetrated a massive and systematic fraud proven, in order to recover damages, each Plaintiff would still have to prove the essential facts of his or her own case. That proof would need to include he or she relied on fraudulent or negligent misrepresentations to

---

[4] Damages are not available for the unfair competition cause of action. (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 173.)

15

his or her detriment, the loan was unsuited to him or her, the value of his or her home was inflated due to Defendants' actions and not some other cause, the appraisal used was in fact inflated, and he or she suffered damages from the inflated value. Each of the 90 plaintiffs alleging wrongful foreclosure would have to prove individually how and why the foreclosure of his or her deed of trust was wrongful.

Federal courts have addressed joinder of the claims of massive numbers of plaintiff borrowers under the same or similar circumstances and theories of recovery. Those courts consistently have concluded that groups of plaintiffs who were pursuing claims based on individual mortgage transactions were misjoined. In *Visendi v. Bank of America, N.A.* (9th Cir. 2013) 733 F.3d 863, 866 (*Visendi*), the United States Court of Appeals for the Ninth Circuit addressed whether 137 plaintiffs, who had sued 25 financial institutions, were misjoined. The plaintiffs alleged the defendants' deceptive mortgage lending and securitization practices diminished the value of their homes, impaired their credit scores, and compromised their privacy. (*Ibid.*) The plaintiffs asserted eight causes of action, including rescission, fraud, and negligent misrepresentation. (*Ibid.*) The Ninth Circuit concluded the allegations lacked the factual similarity required for joinder under Rule 20(a)(1)(A): "This case involves over 100 distinct loan transactions with many different lenders. These loans were secured by separate properties scattered across the country, and some of the properties, but not all, were sold in foreclosure. While Plaintiffs allege in conclusory fashion that Defendants' misconduct was 'regular and systematic,' their interactions with Defendants were not uniform. Factual disparities of the magnitude alleged are too great to support permissive joinder." (*Visendi*, *supra*, at p. 870.)

In *Barber v. America's Wholesale Lender* (M.D.Fla. 2013) 289 F.R.D. 364, 365 (*Barber*), the complaint asserted claims by at least 18 different borrowers against at least nine different lenders arising out of 15 separate mortgages entered into with 10 different lenders. The plaintiffs alleged they mistakenly believed they were entering into a "traditional borrower/lender relationship with Defendants" when in fact the loans were

16

"'conduit' loans" that were to be pooled into mortgage-backed investment vehicles. (*Id.* at p. 366.) The plaintiffs also alleged they suffered harm when their loans were sold to third party investors as part of the securitization process. (*Ibid.*) The district court concluded the plaintiffs were misjoined, even though their claims raised similar legal issues, because "each individual loan made by a Defendant to a Plaintiff was a separate 'transaction' or 'occurrence.'" (*Id.* at p. 367.)

In *Abraham*, *supra*, 947 F.Supp.2d at page 226, the plaintiffs were several hundred current and former homeowners who sued several dozen mortgage originators and servicers. The plaintiffs alleged the defendants induced them to enter into mortgages based on inflated appraisals; failed to comply with underwriting guidelines; purposefully avoided local recordation statutes; bundled, packaged, and sold their mortgages to investors "while simultaneously betting against those mortgages"; and failed to use federal funds to help the plaintiffs as required by law. (*Id.* at pp. 226, 227.) As a result, the plaintiffs claimed, they lost equity in their homes, suffered damages to their credit ratings, and incurred unnecessary costs and expenses. (*Ibid.*) The plaintiffs asserted various tort causes of action, including fraud, deceit, fraudulent concealment, and intentional and negligent misrepresentation. (*Id.* at p. 226.)

The district court granted the defendants' motion to dismiss based on misjoinder under Rule 20. (*Abraham*, *supra*, 947 F.Supp.2d at pp. 226, 228-230.) The court concluded the "'"essential facts of the various claims"'" were not "'"logically connected"'" because "'[t]he facts surrounding each loan transaction are separate and distinct.'" (*Id.* at pp. 228-229.) Citing a series of other district court decisions, the *Abraham* court concluded, "[i]t is well established that separate loan transactions by different lenders do not constitute a single transaction or occurrence and claims by plaintiffs who engaged in those separate transactions generally cannot be joined in a single action." (*Id.* at p. 229.) "Here," the court stated, "several hundred Plaintiffs have asserted claims against several dozen mortgage originators and service[r]s regarding

17

different mortgages issued in different states over a nine year period. . . . Plaintiffs' separate mortgage transactions do not constitute a single transaction or occurrence under Rule 20." (*Ibid.*) The court also concluded the plaintiffs' allegations the defendants were involved in a common scheme were unsupported and speculative, and insufficient to establish a related series of transactions or occurrences so as to permit joinder. (*Id.* at pp. 229-230, 233-234.)

On point is *Padron v. OneWest Bank* (C.D.Cal., Apr. 7, 2014, No. 2:14-cv-01340-ODW (Ex)) 2014 U.S.Dist. Lexis 47947, page *7 (*Padron*), a "mass action" which had been removed under CAFA to federal court. In *Padron*, the federal district court addressed the issue of joinder of plaintiffs in a lawsuit alleging a theory of a systematic scheme to defraud carried out by the defendants that is similar, if not identical, to that alleged in this case. In *Padron*, 121 plaintiffs, who joined in a CAFA mass action, alleged, as Plaintiffs do in this case, that the defendants, which included the lender, mortgage servicers, the Federal Deposit Insurance Corporation, and a real estate appraiser, "'had ceased acting as conventional money lenders and instead morphed into an enterprise engaged in systematic fraud upon its borrowers.'" (*Padron*, *supra*, 2014 U.S.Dist. Lexis 47947 at pp. *5-*6.) The plaintiffs alleged the defendants placed them into loans the defendants knew the plaintiffs could not afford, abandoned industry-standard underwriting guidelines, concealed or misrepresented the loan terms to induce consent, and intentionally inflated appraisal values through a compliant appraisal company—"'knowing that their scheme would cause the precipitous decline in values of all homes throughout California.'" (*Id.* at p. *6.) Attached to the plaintiffs' complaint was a 264-page appendix providing a factual summary for each plaintiff. (*Id.* at pp. *6-*7.)

The district court dismissed all the plaintiffs except for the first one on the ground they had not satisfied the joinder requirements of Rule 20(a). (*Padron*, *supra*, 2014 U.S.Dist. Lexis 47947 at pp. *5, *8-*9.) The court found the action to be "virtually

18

identical to *Visendi*" in that the plaintiffs alleged the defendants had a common scheme, conspiracy, or policy to intentionally place them into dangerous loans, misrepresent the mortgage terms, artificially inflate appraisal prices, and engage in sham loan modifications. (*Id.* at pp. *12-*13.) The court agreed with the defendants that "'the evocation of the vague strategy, scheme, or "conspiracy" cannot transcend the reality that each Plaintiff's transaction is discrete, unique, and based on Plaintiff-specific facts and circumstances.'" (*Id.* at p. *13.) The court found no common issues of law or fact, stating, "it appears the only glue holding Plaintiffs' disparate claims together is the fact that each involves a mortgage, and the Court will therefore have to address legal questions related to each mortgage." (*Id.* at p. *14.)

*Visendi*, *Barber*, *Abraham*, and *Padron* support the conclusion that each of the mortgage transactions that are the subject of the Complaint is a separate, distinct transaction. The district court in *Padron* addressed the matter of joinder in a complaint that appears to be a virtual copy of the one pleaded in this case. Granted, those federal cases are not controlling and can be distinguished in some respects. Any distinctions do not detract, however, from the central point of direct analogy: Hundreds of mortgage transactions, of different types, made by hundreds of borrowers, with various originators and lenders, with differing interest rates and terms, made over a six-year period stretching from times of economic prosperity to near collapse of the financial system, constitute separate and distinct transactions that do not arise out of the same transaction or occurrence or series of transactions or occurrences.

*Visendi*, *Barber*, *Abraham*, and *Padron* are but the tip of the iceberg. Many other federal decisions from across the nation have reached the conclusion that similar claims made by home loan borrowers are not susceptible to joinder, for example:

—*D'Angelis v. Bank of America, N.A.* (E.D.N.Y., Jan. 16, 2014, No. 13-CV-5472(JS)(AKT)) 2014 U.S.Dist. Lexis 6087, page *7 ("Here, Plaintiffs' claims do not arise out of the same transaction or occurrence. This case involves eight

19

different lenders and over 100 discrete loans secured at different times for separate properties across twenty-eight different states.")

—*Martin v. Bank of America, N.A.* (E.D.N.Y., Mar. 12, 2014, No. 13 Civ. 02350 (ILG) (SMG)) 2014 U.S.Dist. Lexis 32231, pages *4, *10-*13, *15-*16 (District court grants motion to sever claims brought by 119 plaintiff borrowers.)

—*Garner v. Bank of America Corp.* (D.Nev., May 13, 2014, No. 2:12-CV-02076-PMP-GWF) 2014 U.S.Dist. Lexis 66203, page *10 ("While Plaintiffs here allege in some detail an overarching conspiracy and coordinated conduct, which the *Visendi* plaintiffs apparently did not allege or alleged only in conclusory fashion, Plaintiffs' claims nevertheless will entail individualized inquiry, such as what representations were made to them by their respective loan officers and whether each Plaintiff justifiably relied on those alleged misrepresentations.")

—*Kalie v. Bank of America Corp.* (S.D.N.Y. 2013) 297 F.R.D. 552, 555, 557 (District court granted motion to sever claims brought by 16 plaintiffs because each of them "entered into a different loan transaction at a different time . . . relate[d] to a distinct property.")

—*Gonzalez v. Bank of America, N.A.* (N.D.Cal., Aug. 4, 2012, No. 12-1007-SC) 2012 U.S.Dist. Lexis 120702, pages *4-*5 (30 plaintiffs improperly joined because their claims arose out of at least 26 loan transactions.)

—*Richards v. Deutsche Bank National Trust Co.* (C.D.Cal., Aug. 15, 2012, No. CV 12-4786 DSF (RZx)) 2012 U.S.Dist. Lexis 115302, page *2 ("The test for permissive joinder is not met in this case as each Plaintiff's claim involves a different loan transaction and foreclosure. Plaintiffs' wholly unsupported and speculative allegation that the various Defendants conspired to defraud each individual Plaintiff . . . does not satisfy the requirement that Plaintiffs' claims arise out of the same transaction, occurrence, or series of occurrences, nor does it obviate the need for separate proof as to each individual claim.")

—*Martinez v. Encore Credit Corporation* (C.D.Cal., Sept. 30, 2009, No. CV 09-5490 AHM (AGRx)) 2009 U.S.Dist. Lexis 96662, pages *5-*6 (Improper joinder of 19 plaintiffs with claims arising out of distinct facts involving mortgages on 15 separate properties.)

The Complaint in this case is not distinguishable in any meaningful way from the complaints found by these federal courts to be based on misjoinder of plaintiffs, except in one respect—size. The Complaint in this case, with 965 plaintiffs, 818 of whom have appealed, dwarfs even the largest of the federal lawsuits.

**IV.**

**"Broad Construction" of Code of Civil Procedure
Section 378 Does Not Justify Joinder
of 818 Appealing Plaintiffs.**

In concluding joinder is proper, the majority emphasizes that Code of Civil Procedure section 378 must be broadly or liberally construed. While that is an undisputed proposition (*State Farm*, *supra*, 45 Cal.App.4th at p. 1113; see *Kraft v. Smith* (1944) 24 Cal.2d 124, 129 ["'statutes relating to joinder should be liberally construed'"]), broad construction is not a substitute for rigorous application of the statutory standards to the Complaint. Section 378 cannot be construed broadly or liberally enough to justify joinder of the claims of the 818 Appealing Plaintiffs in this case. As a panel of this court has said, albeit in a different context, "liberal construction can only go so far." (*Soria v. Soria* (2010) 185 Cal.App.4th 780, 789.)

According to the majority, broad construction of Code of Civil Procedure section 378 is exemplified by four California appellate court opinions upholding joinder. I will analyze each of them and explain why none of those cases supports the majority's conclusion. In *Anaya v. Superior Court* (1984) 160 Cal.App.3d 228, 231 (*Anaya*), some 218 employees and their family members joined, in a single lawsuit, their claims they suffered injuries from exposure to hazardous chemicals while working for the defendants

over a period of 20 to 30 years. The Court of Appeal held the plaintiffs were properly joined, stating: "The employees are said to have been exposed to harmful chemicals at one location over a period of many years by inhalation, drinking of water, and physical contact. Thus, they were all involved in the same series of transactions or occurrences and assert rights to relief therefrom. The fact that each employee was not exposed on every occasion any other employee was exposed does not destroy the community of interest linking these petitioners." (*Id.* at p. 233.)

The majority finds *Anaya* instructive because in that case issues of liability were common while the differences between each plaintiff's claim were limited to individual damages. In *Anaya*, *supra*, 160 Cal.App.3d at page 233, the employees suffered injury by exposure to the same harmful chemicals at the same location while working for the same employer. In marked contrast, in this case, the issues of liability are not common. As I have explained, even if Plaintiffs proved their allegations Defendants engaged in a mass and systematic fraud, each of the hundreds of Plaintiffs nonetheless would have to prove liability as to him or her. Plaintiffs, who are related only by the fact they live in California, entered into hundreds of different loan transactions, each secured by different real property, through a variety of brokers and agents, who made differing sets of representations, and the loans were funded by many lenders. Putting aside the difficulties in comparing a toxic tort action with a breach of contract/secured real property/business tort action, the analogy between *Anaya* and this case is inapt.

The majority also posits that *Anaya* supports joinder in this case because the *Anaya* court emphasized that Code of Civil Procedure section 378 permits joinder when "'*any* question of law or fact common to all' plaintiffs will arise." (*Anaya*, *supra*, 160 Cal.App.3d at p. 233.) Such an interpretation of section 378 relates to the second requirement of section 378(a)(1) and ignores the first. If joinder could be accomplished whenever any single common question of law or fact arises, then the scope of section 378

22

would be boundless and untethered to a requirement of section 378(a)(1) that the right needs to be "in respect of" or "arising out of the same transaction, occurrence, or series of transactions or occurrences."

As another example of broad construction, the majority offers *Moe*, *supra*, 207 Cal.App.4th at pages 827-828, in which two patients alleged they were victims of separate sexual assaults committed by a physician. The patients and their husbands sued the physician and his two employers for medical malpractice, battery, and various other torts. (*Id*. at p. 828.) The trial court sustained a demurrer without leave to amend based on misjoinder of plaintiffs, and the Court of Appeal affirmed as to the physician. (*Ibid.*) The *Moe* court concluded the events alleged did not constitute a single transaction because two sets of plaintiffs were suing for "separate and distinct sexual assaults during separate and distinct time periods." (*Id.* at p. 833.) "[T]he gravamen of plaintiffs' claims against [the physician] is the harmful sexual touching that was perpetrated against each victim on separate occasions." (*Id.* at p. 834.) But as to the defendant employers, the court held the plaintiffs were properly joined because the claims against the employers arose from the same related series of transactions—the negligent hiring and supervision of the physician. (*Id.* at p. 835.)

*Moe* is apt, the majority says, because, here, as in that case, "there is much in the way of common evidence and theories of liability." (Maj. opn., *ante*, at p. 15.) But *Moe* bears no similarity factually or legally to this case and provides no assistance in identifying what that common evidence or those common theories might be.

Particularly instructive, according to the majority, are *State Farm*, *supra*, 45 Cal.App.4th 1093, and *Adams v. Albany* (1954) 124 Cal.App.2d 639 (*Adams*). In *State Farm*, *supra*, 45 Cal.App.4th at pages 1098-1099, the Court of Appeal held the claims of 165 plaintiffs against their insurers were properly joined in a single action. The plaintiffs alleged the insurers had engaged in a systematic practice to deceive their insureds regarding the purchase of earthquake insurance. (*Id.* at p. 1113.) The plaintiffs alleged

23

the insurers, without adequate notice of a reduction in the scope of coverage, issued policies of earthquake coverage to replace endorsements to coverage without a change in premium. (*Ibid.*) In addition, the complaint alleged systematic claims handling practices. (*Ibid.*) The Court of Appeal concluded those allegations established, at least at the pleading stage, proper joinder of the plaintiffs under Code of Civil Procedure section 378. (*State Farm*, *supra*, at p. 1114.)

In *State Farm*, *supra*, 45 Cal.App.4th at page 1113, each plaintiff purchased the same homeowners insurance policy with identical earthquake coverage from the same insurer, and were allegedly defrauded in precisely the same way. That is not the case here. The majority notes that the plaintiffs in *State Farm* alleged they suffered 15 different types of improper claims handling processes, and "[i]f the joinder of a wide variety of claims handling practices was appropriate under *State Farm*, the joinder of various forms of loan impropriety here seems equally correct." (Maj. opn., *ante*, at p. 14.)

The *State Farm* court concluded joinder was proper, however, both because the plaintiffs alleged the insurers engaged in systematic claims handling practices *and* because they issued policies reducing the scope of coverage without adequate notice. (*State Farm*, *supra*, 45 Cal.App.4th at p. 1113.) The allegations of the latter practice, the court stated, "clearly reflect a claim containing common facts central to the alleged deception." (*Ibid.*) As for the former practice, the complaint alleged the defendants engaged in 15 different claims handling practices as to all the plaintiffs. (*Id.* at pp. 1099-1100.) The Court of Appeal noted that "[w]hile not every plaintiff may have been victimized by the same claims handling practice, that is a matter which can be resolved in discovery." (*Id.* at p. 1113.) In other words, the complaint itself alleged claims handling practices common to all the plaintiffs. Since the Court of Appeal was addressing the trial court's order overruling a demurrer, the allegations of the complaint had to be accepted as true, with the proviso that the claims could be sorted out in

24

discovery.  Here, the differences between the claims of each of the Appealing Plaintiffs are apparent from the face of the Complaint and its attachments, and Plaintiffs have neither alleged nor argued a systemic set of misrepresentations made uniformly to each of them.

In *Adams*, *supra*, 124 Cal.App.2d at page 640, each plaintiff entered into the same contract with the same developer, who allegedly overcharged them and failed to build their homes in conformity with the same required plans and specifications.  All the homes were part of the same subdivision, each of the transactions was "exactly similar in kind and manner of operation," and the same misrepresentations were made to each of the plaintiffs.  (*Id.* at p. 647.)  The agreements and instruments involved differed only "for incidental variations in details."  (*Ibid.*)  The facts of *Adams* are not even remotely similar to the allegations of the Complaint in this case.

None of these cases—*Anaya*, *Moe*, *State Farm*, or *Adams*—supports joinder of the 818 Appealing Plaintiffs into a single lawsuit under a broad construction of Code of Civil Procedure section 378.  In none of these cases was broad construction the driving force behind the Court of Appeal's decision to uphold joinder.  In each case, the Court of Appeal, though noting the principle of broad construction, applied the standards of section 378 or its statutory predecessor to the facts at hand to reach a conclusion.

The majority argues this case is merely a "quantitatively" larger version of *Anaya*, *Moe*, *State Farm*, and *Adams*.  (Maj. opn., *ante*, at p. 15.)  But, as I have explained, the facts and allegations of those cases are not qualitatively similar in the remotest way to the allegations of the Complaint.  It makes far more sense to turn for guidance to authority that is qualitatively similar to this lawsuit.  We have such authority in abundance:  *Visendi*, *Barber*, *Abraham*, *Padron*, and the host of other federal cases dealing with the very issues presented by this appeal.  That authority squarely demonstrates the trial court did not err by concluding Appealing Plaintiffs were misjoined.  The majority attempts to distinguish *Visendi*, *Barber*, and *Abraham* in a

25

footnote by describing them as "merely mak[ing] the point that genuinely *multiple* defendants are inconsistent with the federal permissive joinder rule." (Maj. opn, *ante*, at p. 16 & fn. 18.) The majority's characterization of those cases is inaccurate and unduly dismissive. Indeed, as shown, the federal permissive joinder rule is the same as California's.

## V.

### Providing Litigation Strategy to Appealing Plaintiffs Is Neither Appropriate nor Warranted.

The majority offers advice for dealing with a lawsuit of the 818 Appealing Plaintiffs. The majority advises Appealing Plaintiffs' counsel to go back and redraft the "desultory and scattered" allegations of the Complaint into something briefer and to include subclasses to make the case more manageable. (Maj. opn., *ante*, at pp. 18-19.) The Complaint does not suffer from lack of organization, certainty, thoroughness, or clarity. The Complaint is indeed lengthy, particularly with the attachments, but the length is directly attributable to the enormous number of plaintiffs joined, the causes of actions asserted, and the nature of the fraudulent scheme alleged.

More importantly, Appealing Plaintiffs did not ask for our advice in drafting the Complaint, and it is not ours to give. Appealing Plaintiffs are the masters of the Complaint, and we must accept the Complaint's allegations "at face value" (*Aryeh v. Canon Business Solutions, Inc.*, *supra*, 55 Cal.4th at p. 1202), including its organization, length, and theories and modes of recovery asserted. Based on the Complaint, as presented to us, we must decide only whether joinder was proper.

The majority asserts, "the ability to organize class actions into appropriate subclasses" is "important for our purpose here." (Maj. opn., *ante*, at p. 19.) Subclasses are an important tool for making class actions more efficient (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 821) but, as I emphasized at the outset, this is not a class action. Plaintiffs chose not to bring a class action. At oral argument, Appealing Plaintiffs'

26

counsel confirmed this was not a class action and the creation of subclasses was not an issue on appeal. The majority's speculation as to what Plaintiffs should have alleged is, in my view, inappropriate and is an ill-advised advisory opinion. The majority's suggestion that Appealing Plaintiffs and the trial court come up with subclasses serves to emphasize my point: Plaintiffs were misjoined in the first place.

The majority calls this case a mass action rather than a class action, and says its decision is without prejudice as to whether CAFA applies. (Maj. opn, *ante*, at p. 20.) As I said at the beginning, the term "mass action" is found in CAFA, and mass actions are not recognized in the Code of Civil Procedure. A mass action is by definition a *class action* made removable to federal court. (28 U.S.C. § 1332(d)(11).) If Plaintiffs' lawsuit is a mass action under CAFA, then Defendants, who, like Plaintiffs, are represented by skilled and experienced counsel, have chosen, for whatever reason, not to remove it. In any event, Plaintiffs' lawsuit might not be a mass action because the Complaint alleges that all of the claims in the action arose from "an event or occurrence" within the State of California and that Plaintiffs suffered their injuries in this state. (28 U.S.C. § 1332(d)(11)(B)(ii)(I).)

Finally, the majority seeks to offer the trial court help in managing this litigation behemoth by reminding the court of its inherent power to control the order of issues to be tried, to supervise and control litigation, and to conserve judicial resources. (Maj. opn., *ante*, at pp. 19-20 & fn. 21.) I am sure the trial judge, who is an excellent and respected jurist, was well aware of those powers and the need to conserve judicial resources, and considered them when sustaining the demurrer for misjoinder. In any event, the claims have been misjoined under section 378(a)(1) for all the reasons I have discussed and the majority opinion is in conflict with many opinions facing the identical issues.

Affirming the judgment of dismissal would not leave Plaintiffs without recourse or recompense. Each Plaintiff can pursue his or her own lawsuit for fraud,

27

negligent misrepresentation, and, as the case may be, wrongful foreclosure. In addition, the Complaint alleges a cause of action for unfair competition in violation of California's unfair competition law, Business and Professions Code section 17200 et seq., based on the allegations that Defendants engaged in a massive conspiracy and fraudulent scheme to place borrowers into loans for which they were unsuited, to securitize and sell those loans on the secondary market, and to artificially inflate real estate prices in California. Business and Professions Code section 17203 permits recovery of restitution without individualized proof of deception, reliance, and injury. (*People v. Sarpas* (2014) 225 Cal.App.4th 1539, 1548.)



FYBEL, J.